## PFAFF v. UNITED STATES.

### HUGHEL v. SAME.

#### Nos. 5702, 5733.

Circuit Court of Appeals, Seventh Circuit.

June 25, 1936.

Fred E. Hines, of Noblesville, Ind., for appellant Pfaff.

Clair McTurnan, of Indianapolis, Ind., for appellant Hughel.

Val Nolan, U. S. Atty., and B. Howard Caughran and Paul A. Pfister, Asst. U. S. Attys., all of Indianapolis, Ind., for the United States.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

EVANS, Circuit Judge.

An indictment was returned in the District Court, Indianapolis Division, which charged the appellant in No. 5702 and the appellant in No. 5733 with violation of section 215 of the United States Criminal Code (18 U.S.C.A. § 338). Both appellants were convicted and sentenced to the penitentiary and to pay fines. Separate appeals were taken which were consolidated for oral argument, and both cases will be disposed of in one opinion.

The assignments of error are directed to the indictment, the sufficiency of the evidence to support the conviction, and prejudice suffered by appellants on account of inflammatory newspaper headlines and comments of court and counsel which, it is charged, prejudiced the jury against both appellants. Disregarding other assignments of error, counsel in both appeals have centered their attack on the insufficiency of the evidence to sustain the verdict and have most earnestly argued that their clients are innocent, that circumstances pointing to guilt may be satisfactorily explained on the hypothesis of innocence. They assert that appellants were the victims of the prejudicial influence of newspaper headlines and that court's and counsel's observations were potent because of the close and heated fact dispute.

We have been impressed by the earnestness of counsel. Their faith in their clients' innocence, notwithstanding the verdict of the jury, is apparent. As a result, we have examined the evidence with great care to ascertain whether the same can be fairly reconciled with appellants' asserted innocence, as well as to determine the decisive issue in the case, viz., whether the evidence called for the submission of the issue of guilt to the jury.

Appellants assert that they were the victims of the adverse business conditions which not only swamped but wiped out many other reputable, sound financial houses. They say they erred only because the rally in prices and prosperity was delayed longer than they expected—a mistaken view entertained by many others in positions both high and low.

Their business was to purchase and sell securities and to recommend investments to others. They were well established and enjoyed a good reputation which was well earned and deserved. The rapid decline in the price of securities and the expectation that revival was near at hand led to the growth of unjustifiable hopes, but in all of the doings and transactions of Pfaff & Hughel, Inc., which appellants operated, there was no criminal misconduct, no scheme to defraud, and no intent to cheat any customer. This is the position of counsel for appellants.

It is the Government's urge, on the other hand, that, while P. & H., Inc. enjoyed a good reputation for years and conducted a sizable business at a profit, there came a time in its history when due to the depression and the sinking prices, the capital of the company was wiped out and it was bankrupt to the knowledge of appellants who were its officers, operators, and principal owners. It is argued that, at this time in a vain and desperate effort to recoup their fortune, appellants conceived

the scheme, which they carried out, of defrauding the customers by selling securities to them on account, or partial payment, which they could not and did not deliver when the last installments were paid by the purchasers. In order to prevent a demand for securities when payments were completed, appellants caused their sales agents to sell additional securities to such purchasers, also on installment plan, and thus then postponed the date of delivery of securities.

Our conclusion is that the evidence permits of no construction or explanations that would justify a court in taking the case from the jury. A directed verdict was properly denied.

█ Whatever may have been the motives— however hopeful the appellants may have been of a quick rally, the solemn and inescapable facts are—This company was insolvent, a wreck on the rocks of the 1929 financial debacle. So were appellants, individually. Their customers were unaware of their condition or that of their company. To recoup their fortunes and that of their company they sold, on the installment basis, stock which they did not possess. They used the money to purchase more speculative securities (stock of a brewery) in the hope that their rise would be higher and faster than the securities sold. They were mistaken. They and their company sank deeper into the mire. The deeper they sank the greater became their efforts to extricate themselves and the worse they sinned against others.

At least the evidence points to such a conclusion. Not only is there evidence to support the existence of such a plan or scheme, but there is almost no evidence from which a contrary conclusion can be legitimately drawn.

█ Nor are we satisfied that there was any prejudicial error committed by court or counsel. It appears that the newspapers were quite indifferent to their obligations to assist in the securing of a fair trial, but their indifference did not affect the jurors because it does not appear that any juror read or was influenced by what he saw in the newspapers. They were admonished by the court not to read articles pertaining to the case.

In the course of the trial, upon receipt of certain evidence which reflected on appellants, the court made certain observations in the presence of the jury to which appellants' counsel took exception and also asked to withdraw a juror. What took place in the presence of the jury is the basis for the charge of prejudice. The court thereafter charged the jury to disregard what he had said.

While we are satisfied that the words spoken by the trial judge carried more weight than they would have carried had one not occupying official position spoken them, and were more likely to influence the jurors because of the high respect which they held for the judge who tried this case, yet there are two circumstances present in the instant situation which relieved the spoken words of ˙what otherwise would have been unfortunate observations, if not error.

In the first place, the court sought, and we think succeeded, in removing any prejudice which may have occurred. In fact, it is at least fair to assume that the jury, in view of the admonition of the court, disregarded the court's statement.

█ The other circumstance lies in the support which the record offers for the court's allegedly prejudicial remarks. Judges are not automatons. They are expected to guide the jury to intelligent action. Their duty is not fulfilled unless they help that body, i. e., guide its deliberations. To do so, judges must take charge of the trial. They cannot "stand by." They, rather than counsel, are responsible for respect-inspiring verdicts by juries, and for favorable public opinion which an orderly, intelligent, well-directed trial inspires. Ruling upon the admission of evidence, pronouncing certain stereotyped rules of law which define reasonable doubt, presumptions of innocence, and the quantum of proof necessary to convict, do not meet this obligation. It rests with the court to see that the trial of a criminal case (or a civil action) results in the finding and pronouncement of the truth.

█ Had the observation which was made in the course of the trial been made in the form of a charge to the jury, would it have been fatally prejudicial? Judges presiding in Federal courts may comment upon the evidence and express opinions respecting the effect of such evidence, even of guilt or innocence of the accused. Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185; Sparf v. United States, 156 U.S. 51, 715, 15 S.Ct. 273, 39 L.Ed. 343. There are instances when the duty to do so is clear. More errors have been committed by overcautious avoidance

of discussion of vital and determinative issues in many a criminal case than in meeting the issue squarely, analyzing the evidence, and pointing out its applicability, as well as its pertinency and its persuasiveness.

The facts which elicited the comment of the court may be briefly stated:

Among the customers of Pfaff & Hughel, Inc., was one Mrs. Crosley. She had given to the appellants for investment $800,000 of bonds, mostly municipals. Many of them were listed in one of the stock exchanges—the charge for selling such bonds on the Board was $2.50 per thousand dollar bond. There had been a default in some of them. It was in reference to the sale of these bonds and the appellants' exorbitant exactions which provoked the comment of the court. A witness, a bookkeeper, one Whitacre, was examined. We give the substance of his testimony:

I have invoices of the record of the securities which Mrs. C. turned over to P. & H. Inc., and also a record of the disposals of those shares—there were $10,000 Argentine 6s sold for $3,700, par value of them was $10,000. There were $25,000 Alachua County Road Bonds sold by P. & H. Inc. for $18,042.71 and the credit given Mrs. C was $15,167.71. There were $25,000 Lakeland Florida Relief Bonds sold for $10,200 and Mrs. C paid $8,500. There were $38,000 City of Orlando bonds purchased from Mrs. C at $19,380 and sold for $22,500. There were $25,000 St. John County Road Bonds and Mrs. C's account credited with $15,750 out of a sales price of $19,000. $25,000 St. Petersburg Improvement 6% bonds sold for $9,500 and Mrs. C credited with $8,000. $10,000 Winter Haven Fund Bonds, 5½% were sold for $4,000 and $3,300 credited to Mrs. C. $25,000 Jackson, Mississippi, bonds sold for $22,750, of which $15,250 was credited to Mrs. C. $25,000 Vicksburg, Mississippi, relief bonds were sold for $21,375 and Mrs. C credited with $18,875. $23,000 relief bonds were also sold for $20,585 and of that sum Mrs. C. was credited with $16,445.

It was at this point that the court made the following observations:

The Court: "You wouldn't need many customers like that to stay in business."

The Court: "That is about the worst I ever heard in this court room."

Mr. Parr: "Now, Your Honor, we move—"

The Court: "Go ahead with your next question."

Mr. Parr: "The defendant moves for a mistrial, Your Honor."

Mr. Parr: "May I have that motion ruled on? May I insist on a ruling for my client?"

The Court: "Any motion that you have made is overruled."

Mr. Parr: "Does the record show our exception?"

The Court: "Show an exception to the ruling, Mr. Reporter."

It also appears that the court repeatedly ordered counsel to sit down.

The witness then continued with his testimony of sales of other bonds for the account of this customer and a profit to P. & H. Inc. A profit of about 25% was made by P. & H. Inc. for buying and selling this customer's securities, and they were all sold at an inexcusable and unnecessary sacrifice.

It was not the comment of the court that was prejudicial. It was the action of appellants which elicited the remark that harmed them. The deductions of any jury were more damaging than the observations of the court. Silence on the court's part would not have helped.

It is true that the direction of the court to counsel to "sit down" was somewhat unfortunate. The direction should have been followed, yet counsel was undoubtedly anxious to fully protect his client. Had he complied with the direction, however, proceedings would have been orderly and the atmosphere which was becoming heated, would have instantly cooled.

■ The question before us is one involving the effect of the repeated order by the court to counsel and of counsel's refusal to comply. When the direction was finally complied with, the request for a ruling was promptly made and counsel given an exception. We therefore believe the only serious phase of this question arises from the observations which the court made respecting the evidence which had just been received. As to it, we are persuaded that the comment did not constitute reversible error. Moreover, the court's later admonition to the jury to disregard it was corrective and restored the court room atmosphere to its contemplative calm. Juries are not composed of men devoid of experience, and we would underestimate their common sense if we assumed that an oc-

casional outbreak in court so upset jurors as to impair their ability to further fairly function.

Other assignments of error will not be considered specifically. They were not seriously pressed on the oral argument, and we are satisfied that no error was committed in respect to any of them. The indictment followed the form of one that had been approved by this court.

The judgment is

Affirmed.