**UNITED STATES v. LEE.**

No. 6867.

Circuit Court of Appeals, Seventh Circuit.

Nov. 22, 1939.

Francis E. McGovern, of Milwaukee, Wis., for appellant.

B. J. Husting, U. S. Atty., and Carl R. Becker, both of Milwaukee, Wis., for appellee.

Before MAJOR, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

The defendant, Royal Lee (trading as the Vitamin Products Company of Milwaukee, Wisconsin), appeals from a judgment which pronounced a sentence upon him after conviction by jury. In four counts, the indictment charged him with the interstate shipment of his product "Catalyn" on October 23 and November 2 of 1933, and with the misbranding of Catalyn, thereby violating Sections 2 and 8 of the Food and Drug Act of 1906, as amended. See 21 U.S.C.A. §§ 2, 9, 10; see also Secs. 1 and .7.

Counts 1 and 3 of the indictment charged that certain representations, pertaining to the curative and therapeutic effect of Catalyn and printed on the bottle labels, wrappers and enclosures, were false and fraudulent. 21 U.S.C.A. § 10. In this regard, it was alleged that by these means defendant intended to deceive buyers and to create in their minds the impression that

Catalyn contained ingredients effective to cure, mitigate, or prevent over fifty enumerated ailments, e. g., dropsy, goiter, heart trouble, and stomach ulcers.

Counts 2 and 4 of the indictment charged that certain statements pertaining to the contents or ingredients of Catalyn were false and misleading. 21 U.S.C.A. § 9. In this connection, it was alleged that the particular information on the bottle labels indicated falsely that Catalyn contained definite proportions of the various vitamins. On this appeal, the fact finding of interstate commerce, amply supported by the evidence, was not contested. 21 U.S. C.A. § 2.

The defendant was tried before the jury and convicted on all four counts. The court imposed sentence and the defendant appealed therefrom. In his appeal, defendant urges consideration of the following assigned errors: (1) refusal to discharge defendant at the close of plaintiff's case; (2) justice not done; (3) misconduct of trial judge; (4) improper admission and rejection of evidence; (5) improper assessment of costs; (6) refusal to grant bill of particulars; and (7) erroneous instructions. Our considerations follow.

█ *Refusal to Discharge Defendant at close of Plaintiff's Case.* In order to consider the error here assigned, it is necessary to analyze the Government's evidence in the light of the charge made in the indictment. In this case, defendant holds his Catalyn tablet out to the buying public as containing various vitamins and definite proportions thereof; he also states that Catalyn is effective for the treatment of certain enumerated diseases and ailments. On the other hand, the Government alleges in the indictment that Catalyn does not contain the named vitamins or definite proportions thereof, and that Catalyn's therapeutic claims are exaggerated and intended to deceive the public. Has the Government proved its case?

Evidence adduced in the form of physical and documentary exhibits clearly show Lee's representations concerning the contents and curative effect of Catalyn. The bottle label stated that the bottle "Contains Vitamins: A-B-C-D-E-F-& G; in such proportions as to most effectively restore normal metabolism where abnormality is present." The blue circular accompanying the bottle of Catalyn tablets stated, in substance and among other things, that Cata-

lyn was effective for the treatment of Pernicious Anemia, Dropsy, Goiter, Heart Trouble, Underweight, Pneumonia, Bright's Disease, St. Vitus Dance in Children and Stomach Ulcers. Booklets advertising Catalyn revealed such statements as "Catalyn * . * * Recommended and Guaranteed for Goiter, Heart Trouble, * * * Insomnia, * * * Anemia, * * * Dropsy * * *."

The Government introduced evidence relating to the composition and constituent ingredients of Catalyn. The testimony in this regard disclosed that Catalyn did not contain vitamins A, C or D, and that it did contain 1³⁄₁₀ international units of vitamin B and vitamin G equal to ½ gram of dried yeast. Further testimony indicated that vitamin G is now known as vitamin B, and pointed out that the user would have to take 150 Catalyn tablets per day to meet the body's daily minimum need therefor.

It is obvious that this evidence refutes defendant's representations that Catalyn consisted of vitamins A-B-C-D-E-F-G in "such proportions as to most effectively restore normal metabolism where abnormality is present." In addition, this evidence also militates against defendant's assertions that Catalyn possessed therapeutic value, for Catalyn's curative powers are necessarily based on the named vitamins.

The source of the evidence discussed above is the biological analysis of Catalyn conducted by the *Vitamin Division of the United States Food and Drug Administration.* This vitamin assay of Catalyn was made under the supervision of Nelson, a recognized authority on vitamins and vitamin standards. Nelson was aided by Irish (chemist), who directly determined the vitamin contents of Catalyn and who also made a chemical analysis in the case of vitamin C. This bio-assay analysis was supported by a qualitative examination by Yakowitz (analytic chemist), microscopic examination by Keenan (microanalyst), and a quantitative examination by Lightbody (pharmacologist).

The bio-assay test used here, namely, the bio-logical method of measuring the vitamin contents of a given product by employing experimental animals (white rats and guinea pigs), is the test accepted and the method officially recognized by the consensus of expert opinion in the field of medicine, pharmacy, and nutrition. In this

case, the accuracy of the biological analysis and the evidence obtained therefrom stands uncontradicted and unquestioned.

In this connection, it is interesting to note that defendant's witness Dr. Barrett, in discussing the bio-assay test, remarked that it is "the best way we now have" to determine the presence or absence of vitamins in a given product. Moreover, defendant's witness Dr. Kanoky testified that "if I wanted to know how much vitamin there was in a Catalyn pill I would turn it over to a biologist" and that the "bio-assay method is the accepted method by the profession to determine the quantity of vitamins in a given product."

The Government then adduced expert testimony relating to the therapeutic or curative value of Catalyn. In substance, the physicians called by the Government testified to and agreed on two propositions: (1) that assuming the accuracy of the vitamin analysis (and, as we have stated before, the accuracy thereof is not attacked), Catalyn lacks therapeutic merit; (2) that assuming Catalyn contained the represented vitamins, its curative value would nevertheless be confined to vitamin-deficiency cases, which excludes such diseases and ailments as measles, anemia, dropsy, goiter, valve leakage of the heart, pneumonia, Bright's disease, St. Vitus Dance, leg ulcers, and stomach ulcers.

These physicians—Drs. Hart, Sevringhaus, Quick, Lettenberger, Brussock, and Goldwater—explicitly added that their testimonies expressed opinions that represented the consensus of reliable medical knowledge. To us it is significant that defendant's expert witnesses did not controvert these expressions. Such an omission suggests to us that the opinions of defendant's expert witnesses, as to whether the above enumerated maladies are vitamin-deficiency diseases, were personal ones and not in accord with the consensus of reliable medical knowledge.

Dr. Goldwater also testified that he had administered Catalyn to patients. These tests on human beings convinced him that Catalyn was ineffective, and he so informed the defendant almost a year before the Information was filed. The defendant, however, continued to make the representations in question and to state that "There may be some persons (professional and laymen) who, because of ignorance, or because of belief in obsolete therapeutic theories, may cavil 'Catalyn'. Some may even intimate the ineffectiveness of vitamins for some of the ailments we list."

In addition, the advertising booklet devoted considerable space to a series of detailed reports concerning users of Catalyn. In the booklet it was stated that the case reports were "authentic" and represented "Convincing Evidence of the Merits of Catalyn." In this case, the Government introduced evidence refuting the authenticity of some of the case reports, and for our purpose it is sufficient to relate one instance.

The case report of J. M. Reidy disclosed that he was "badly bloated" with dropsy and that he suffered from heart trouble, enlarged prostate gland, and shortness of breath. The report further represented that Reidy started to take Catalyn on December 19 and that by January 28 he was "back to work," with "heart apparently O. K." and "no more shortness of breath."

The Government introduced refuting testimony by Reidy's two daughters and his attending physician. Evelyn Reidy testified that "the only trouble he did suffer from was a heart ailment" and that he did not go back to work on January 28. Mrs. Cyrillus Reidy Nichol, a registered nurse, testified that Reidy was not suffering from dropsy. In addition to verifying the testimonies above, Dr. Farrell, the attending physician, stated that Reidy was not suffering from an enlarged prostate gland. Dr. Farrell added that he had not prescribed Catalyn tablets for Reidy and that he knew Reidy "wasn't taking them."

This evidence clearly bears on the issue of intent and permits the submission of the question of fraud to the common sense judgment of the jury to find whether under the particular facts and circumstances the acts of the defendant were honest, however mistaken, or false and fraudulent. See United States of America v. Dr. David Roberts Veterinary Co., Inc., et al., 7 Cir., 104 F.2d 785, 788. So, we are convinced and conclude that, at this stage of the trial, at the close of the Government's case, the evidence clearly showed that the Government had proved its case, and for this reason we believe that defendant's assigned error thereon lacks substance.

**Justice Has Not Been Done.** This general assignment of error is based fundamentally on the contention that the evidence as a whole does not prove defendant guilty of the particular offense beyond a

reasonable doubt. We have analyzed the Government's evidence and have concluded that at that stage of the trial the court had not erred in refusing to discharge the defendant. We shall now examine the defendant's evidence, keeping in mind that the gist of the offense charged is misbranding and misrepresenting the contents and therapeutic value of Catalyn.

It is interesting to note that the defendant's witnesses, lay and expert, did not state that Catalyn contained the named vitamins. Nor did they question the accuracy of the bio-assay evidence. Nor had they made any analysis of Catalyn. The defendant testified as to how Catalyn was made and what vegetable and animal sources went into the making thereof. At most, the inference that a product made from vitamin-bearing matter contains vitamins creates conflicting evidence, the credibility of which falls within the province of the jury.

Such an inference is not equal to the assuring representation that all the vitamins were present, and almost disappears when matched against uncontradicted evidence that vitamin A, C, and D are absent. Significant here is Lee's answer, when asked what vitamins Catalyn contained, that it "contains materials to produce the effect of all the vitamins." Interesting, too, is Dr. S's statement that although he did not know what was in Catalyn he felt that it helped his patients.

We observe also that the thesis of the expert testimony for the defense is that Catalyn has helped to cure patients subjected to diseases such as enumerated earlier in this opinion. At this point, we must remember that this curative power of Catalyn is ascribed to the vitamins that Catalyn is represented as containing. Of course, this testimony conflicts with the Government's expert testimony, already stated as expressing the consensus of reliable medical knowledge, that even if Catalyn did contain all of the vitamins it would not help cure the diseases so enumerated, because they are not of the vitamin deficiency type.

Moreover, Dr. Goldwater, testifying for the Government, claimed that he administered Catalyn to some of his patients and found it ineffective. In addition to this, defendant's expert witnesses do not question the bio-assay evidence. In this regard, Dr. Kanoky admitted that if the bio-assay test was accurate the effect of Catalyn on his patients must have been "absolutely worthless," or, as Dr. Quigley put it, hardly effective and more like a homeopathic dose than anything else.

Counsel for defendant devotes considerable attention to the testimony rendered by defendant's expert witnesses who testified that they administered Catalyn to their patients in the effort to cure them. On this evidence, counsel bases what he calls the "clinical" or "bed-side" test, which according to counsel is the method used by defendant to measure the vitamin content in Catalyn. The argument presented is that, since Catalyn was given sick patients suffering from vitamin deficiency, it follows that Catalyn contains all the vitamins and the concomitant therapeutic powers.

We confess our lack of appreciation for such argument. In thus expressing ourselves, we do not deny that from the evidence thus adduced by defendant arises an inference that Catalyn contains particular vitamins. In view of the whole record, however, we believe, and shall so show, that the inference is not compelling. Necessarily conflicting with the evidence in question is that part of the record which shows that according to the consensus of medical opinion the enumerated diseases above are not of the vitamin deficiency type.

But this is not all. It is to be noted that defendant's experts administered Catalyn to aid in curing the patient; in not one instance was Catalyn given for the purpose of determining the presence of vitamins. It seems unnecessary to add that the clinical test has not been accepted by the scientific world as a measure of vitamins in any given product, and that Dr. Goldwater tried the clinical test and found it lacking in merit. The record also shows, as we shall describe immediately, that Catalyn administrations ordinarily accompanied the medical or osteopathic treatment of the patient.

The significance of this is clear. A situation was created which gave rise to another and conflicting inference that the sick patient's recovery was due to the medical or osteopathic treatment, at the same time disclosing that none of the factors necessary to quantitative determination of vitamins were under scientific control. Thus, Dr. S (osteopath) administered Catalyn during the osteopathic treatment of his patients, although Catalyn was taken after the discontinuance of the manipula-

tive treatment. Drs. Quigley and Barrett (dentist) did not administer Catalyn to patients, and Drs. Kanoky and Olmstead gave Catalyn to patients in conjunction with medicine and specific vitamin concentrates.

The defense also introduced the testimony of lay witnesses who testified that their self-medication with Catalyn was effective in curing some of the diseases enumerated above. We have examined this lay evidence and find it very unsatisfactory. In general, such evidence is susceptible to the same comments already made as to the expert testimony. It is sufficient to discuss two cases briefly. Mrs. Paul Winzler claimed Catalyn had cured her nervousness. On cross-examination, she admitted that prior to the Catalyn treatments she had followed medical and surgical advice and had her teeth and tonsils removed by surgery. Maria Lichter also claimed that Catalyn had relieved her heart trouble and dropsy. On cross-examination, she admitted that she "made it a point" to eat carrots and drink fruit juices (both well-known sources of vitamins) during the Catalyn treatments.

Now that all the evidence has been analyzed, it might be pertinent to summarize the results found. We find that the bio-assay evidence remains unrefuted and uncontradicted. Counsel for defendant, however, although not disputing this evidence, insists that the evidence is worthless because it is not "connected up with any effect Catalyn may have on human beings." We believe that such insistence by counsel is unwarranted in the face of the facts and circumstances described above.

We are convinced that the expert medical evidence adduced by the government, and substantiated by defendant's expert witnesses Drs. Kanoky and Quigley, serves as a logical and irresistible connecting link between the bio-assay evidence and the therapeutic effect of Catalyn on users thereof. In fact, the record clearly indicates that the presence of vitamins in Catalyn is a condition precedent to the possession by Catalyn of therapeutic value.

The most that can be said of defendant's evidence is that it lends itself to conflicting inferences and conflicts with the government's expert evidence at one point, namely, whether the diseases enumerated herein are of a vitamin deficiency type. Since we have already disposed of this point, we conclude by stating that on the record, as we see it, the Government has proved its case beyond a reasonable doubt. We say, therefore, that defendant's assigned error that justice has not been done does not stand judicial scrutiny.

■ *Refusal to Grant Bill of Particulars.* The Information, consisting of four counts, clearly set out and sufficiently apprised defendant of the nature and cause of the accusations that he must be prepared to meet. Moreover, an application for a bill of particulars is always submitted to the sound discretion of the court. We cannot say the court abused that discretion, Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545.

■ *Improper Assessment of Costs.* The point is made that the court allowed, as part of the taxable costs, the expenses of attendance and travel of witnesses subpoenaed by the Government, but not called to testify, and also the expense of attendance and travel of an unwarranted number of witnesses whose testimony was cumulative or bore only on immaterial issues.

In this case it was necessary for the Government to prove the interstate shipments of the misbranded articles and, to secure the best evidence, it required the original records and witnesses to identify the papers concerning these shipments between Milwaukee and California.

It is true that when witnesses are subpoenaed, but do not testify, the presumption is that their testimony was not material and that they were unnecessarily brought to court, and, in the absence of equitable reasons, the fees of such witnesses are not chargeable against the losing party.

After the verdict, the question of the taxing of costs was brought to the attention of the court upon the duly verified statement of the district attorney and the counter-affidavit of the defendant, and the court, after due consideration, entered the order taxing the costs.

■ Section 974, R.S., 28 U.S.C.A. § 822, provides that upon conviction for any offense not capital, the court may award the costs of prosecution against the defendant. Thus the taxing of costs involves the exercise of discretion on the part of the trial court, whose duty it is to determine whether the witnesses subpoenaed were unnecessarily brought to

528

court or that an unwarranted number of witnesses were used in the prosecution. We cannot say that the court abused this discretion.

*Improper Admission and Rejection of Evidence and Erroneous Instructions.* Defendant has also assigned as further grounds of error, rulings on the admission and exclusion of evidence and refusal of the court to instruct the jury as requested by the defendant. These assignments do not justify lengthy discussion. We have examined them and found them without merit.

■ *Misconduct of Trial Judge.* We have reserved to the last the contention that the prejudicial attitude of the trial judge deprived the defendant of a fair and impartial trial, because this seems to us to present the only error worthy of serious consideration.

The record discloses that the defendant had published a report concerning the case of J. M. Reidy, stating that Reidy was suffering from dropsy, and that after taking four Catalyn tablets a day from December 19 to January 28, the dropsy was reduced to normal. Reidy being deceased, his daughter was called to prove that her father had not had dropsy, and thereupon the following occurred:

"The Court: Do you know how long it was before your father died? A. I imagine—

"Mr. McGovern: (Interposing.) Was it in 1932? A. 1932 I was going to say, yes.

"Q. Your father was ill in 1930? A. Yes.

"Q. Could it be that this meeting with this woman who brought in Glandstone be in 1930? A. No, I don't think it was in 1930.

"Q. Are you sure what year it was?

"The Court: She said her best recollection was 1932.

"Mr. McGovern: But I am asking her if she is sure of that.

"The Court: Are you sure of that? A. I would say 1932.

"Q. You would say, but I am asking, are you certain of that or have you— A. All right, then, I will say it. I will say it then, 1932.

"Q. How is that? A. I will say 1932.

"Mr. McGovern: That is hardly telling us whether you are certain of that or not.

"The Court: She says she will say that now. She is certain of that, and she is giving you that impression and she is telling it to the Court and jury. That is the impression we got. Now proceed.

"Mr. McGovern: Then witnesses need not answer questions on cross-examination as we ask them if they are proper questions.

"The Court: There is no need of trying to put three or four interpretations to a clear answer. Proceed with your cross-examination. The jury will understand what this witness is testifying to. You don't have to comment on her answers at all."

Another instance occurred, it is claimed, in the examination of another daughter of J. M. Reidy. She was a registered nurse, and had testified that there were no outward manifestations that her father had dropsy. In ruling on an objection to that testimony, the court said:

"That goes to the weight of the testimony. The jury can determine what weight they will give to it. * * *

"Here is a nurse who took care of her father and was vitally and deeply interested and concerned, and she perhaps studied his case and knew the symptoms of everything he was suffering from. From your observation of your father and from the knowledge that you had acquired as a nurse and the knowledge you had at that time, was there any indication he was suffering from dropsy?"

In the course of the examination of one Dr. Gerald M. S———, who testified that during 1933 he had treated fifteen patients, that one quite extreme case had cleared up in six weeks—on which he had the case report, the following occurred:

"Mr. McGovern: Go ahead and tell us about the case, you have the book out now. A. That one case report?

"The Court: Yes.

"Mr. McGovern: What was the first disability first stated on that?

"The Court: What was the name of the patient, also.

"Mr. Chambers: * * * It isn't customary to reveal the names of the patients. The doctor, I am sure, has those names.

"The Court: We want the names. We want all the facts. We want to know this. A. Well, your Honor, my understanding has been that the physician is privileged to, in his professional relations, to withhold the name of the patient. That has always been my understanding.

"The Court: We want to know all the facts in this case, Doctor. A. I am perfectly willing to give all the facts, the full name of the patient.

"Mr. McGovern: All right, if the name makes any difference—

"The Court: Well, give the address. That is sufficient. A. * * * This particular case that I have had to mention there cleared up in six weeks, my own, was my own family pet, my own little Boston bulldog * * *

"The Court: Is that why you didn't want to give us the name? A. No. * * * I merely wanted that decision before I revealed the name of some other human patient, that is all.

"The Court: That was ridiculous, Doctor. We are talking about human beings. Were you trying to give this jury and court the impression you were treating a human being?

"Mr. McGovern: Lay that case aside.

"Q. Did you have more than one bulldog patient? A. Oh, yes, over a period of time.

"Q. I see. Well, the court wants to know now what the name of your bulldog was.

"The Court: No, I don't. I want to know the names of the human patients you have treated. If I had not pressed for that information it would not have been disclosed that he was treating a bulldog and not a human being.

"Mr. McGovern: It was sinister. We would have just pulled the wool over the jury's eyes on that."

In the examination of Irish, a chemist employed by the United States Department of Agriculture for over seven years, the court stated: "What is the use of quibbling over this? The witness impresses me as a man that knows what he is talking about, and I don't think he is giving us any idle gossip. He knows what he is talking about." And, in the course of a colloquy, the court said: "Government experts are well qualified, and you (defendant's counsel) should be the last man to criticize those excellent men who have been up on this witness stand, and have told of their long years of preparation and their very fine service to protect the public from fraudulent drugs."

In the examination of the defendant he was asked if he had ever had an analysis made of Catalyn and after he had answered "No," the following occurred:

"The Court: Then how can you tell us what these two drugs are? A. An analysis does not tell anything about the properties of the physical—or therapeutic properties of a—

"Dist. Attorney: This man is not competent to testify as to the therapeutic qualities.

"The Court: No.

"Mr. McGovern: He is an expert on vitamins, and he knows, and your witnesses have said that a chemical analysis is of no use.

"The Court: That is what you say, that he is an expert on vitamins. It is for the jury to determine how much of an expert he is. We don't want any more reference to that."

The trial judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law, Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321; Pfaff v. United States, 7 Cir., 85 F.2d 309, 311, and it is his duty to see that all the truth is brought out so that the jury can arrive at a true verdict. While he has a right to ask questions of witnesses in order to ascertain the facts and elicit the truth as to the points in issue, he must not forget the functions of the judge and assume that of the advocate, lest he give the jury the impression that he favors one side or the other, and the extent to which he participates in the examination of a witness must depend largely upon the circumstances of the particular case and the conditions which arise during the trial. He should also be ever mindful that one of the most important essentials to the performance of the exalted task of upholding the majesty of the law is dignity and decorum.

It is regretable that the court indulged in some of the remarks appearing in the record, but defendant's counsel is not without fault—he was sarcastic, and some of his remarks were improper and impertinent. Viewing the acts and statements of the

court above set out, as well as others complained of, in their relation to the record as a whole and the convincing nature of the evidence to support the verdict, we would not be warranted in concluding that defendant's cause was prejudiced.

The defendant's guilt was amply proved, and there is no reason why the judgment should not be affirmed.

Judgment affirmed.