## STEINER v. UNITED STATES.

### No. 10370.

Circuit Court of Appeals, Fifth Circuit.

March 29, 1943.

Rehearing Denied April 24, 1943.

Saul Stone and Warren O. Coleman, both of New Orleans, La., for appellant.

Herbert W. Christenberry, U. S. Atty., of New Orleans, La., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Arthur A. Steiner, Esther E. Stein, and James R. Stewart were tried, convicted, and sentenced under five counts of a six-count indictment which charged them with use of the mails in furtherance of a scheme to defraud, in violation of Section 215 of the Criminal Code, 18 U.S.C.A. § 338. Steiner alone has appealed.

The indictment charges and the proof shows that Steiner, Stein, and Stewart evolved and put into practice a scheme to procure fraudulent reductions of tax assessments on real and personal property in the City of New Orleans, Louisiana. Steiner, a lawyer, solicited and secured taxpayer clients, agreeing for a fee to secure a tax assessment reduction from the Louisiana Tax Commission. Stewart, chief clerk in the New Orleans office of the Tax Commission, by virtue of his position of trust and confidence, had the client's assessment reduced on the tax rolls and approved by the Commission. Thereafter the taxpayer paid the taxes on the basis of the fraudulently reduced assessment, and from month to month and day to day the monies so paid were covered into the public treasuries. Stein acted as go-between for Steiner and Stewart.

The partners agreed to divide the proceeds of their nefarious scheme. Steiner charged clients a fee of usually one-half of the tax savings, and it was agreed that upon collection of such fees Steiner was to get one-fourth, Stein one-fourth, and Stewart one-half. On occasion letters were written by Steiner for the purpose of collecting fees from clients, and it is shown that Stein·had statement forms printed bearing the heading "Steiner and Stein"; that such forms were used to send statements to clients; and that the forms were furnished to Stewart who mailed them to clients when he had fraudulently procured the agreed assessment reductions. By this scheme a fraud of the most reprehensible kind was perpetrated upon the State of Louisiana, its agencies, and taxpayers, in that assessments were reduced unfairly, inequitably, and fraudulently, thereby preventing collection of the full amount of taxes rightfully due.

The evidence is without dispute that Steiner and his partners defrauded the State and its taxpayers out of many thousands of dollars; that theirs was a continuous and continuing scheme whereby they reaped a rich harvest of unlawful gain not only for one year, but in many cases from year to year; and that after paying taxes for one year taxpayers would find their assessments for the new year raised, and the partners would again have the assessments fraudulently reduced, and send out bills and receive payments. With Stewart working in the Tax Commission office as chief clerk and being in charge of tax estimates and settlements and fully trusted by the Tax Commissioners, the fraudulent scheme might have indefinitely wound its way through devious trails of corruption and fraud; but Steiner, having once embarked on the crime way, could not bring himself to divide the spoils as he had agreed to do. It was only one more step for him to steal from his confederates, and when he did, they commenced to complain and then to threaten him for their part of the monies which he had withheld. Cornered and trapped by his dissatisfied confederates, and facing detection and disgrace, Steiner thereupon sought out an officer of the Louisiana Bar Association and attempted to gain immunity for himself by turning informer against his partners and others whom he named and alleged were engaged in the unlawful "tax racket".

That the mails of the United States were used in furtherance of the scheme cannot, we think, be doubted. The scheme was a continuous one in which these partners in crime worked hand-in-glove to defeat the collection of lawful taxes. The mailing of letters and statements to clients for the collection of fees was a necessary, indeed indispensable, element of that scheme, for without money to bribe Stewart and divide with Stein and Steiner the partnership would have failed. The continuity of the scheme is shown by evidence that clients who withdrew their patronage had their assessments raised. There is no dispute but that tax payments were made after entry of the fraudulent assessment reductions on the tax books. Moreover, if the fees were not paid by clients it reasonably follows that Stewart, who worked the fraud to get the assessments reduced, could use his place and position to get them raised again. In one instance where a client thought a reduction from approximately $140,000.00 to $40,000.00 was too much and declined to accept Steiner's services in the matter, the assessment was caused by the partner Stewart to be raised to in excess of $80,-00.00, an amount acceptable to the taxpayer. Lane Cotton Mills which dispensed with these most successful reduction serv-

ices after using them for several years found that upon dismissal of Steiner its assessments soared even higher than before.

■■■■ Appellant contends that the scheme to defraud the State and its taxpayers was consummated at the instant the illegal tax assessment reductions were entered on the books of the Tax Commission; and that the mails were used after the execution of the scheme and in connection with matters wholly outside the scheme to defraud. Cf. McNear v. United States, 10 Cir., 60 F.2d 861; Dyhre v. Hudspeth, 10 Cir., 106 F.2d 286; Spillers v. United States, 5 Cir., 47 F.2d 893; Stapp v. United States, 5 Cir., 120 F.2d 898. The case at bar is not controlled by those decisions, for here the scheme to defraud had not come to an end when the mails were used. Unless money came in, the scheme would not and could not operate, for Stewart, the keyman with access to the tax rolls, Steiner, the soliciting lawyer, and Stein, the go-between, were all in the scheme for what they could get out of it. The collection of fees for "services rendered" was an integral part of the continuous and operating scheme to defraud, and the mails were used to accomplish their collection. When one of the schemers used the mails for collection of fees in furtherance of the fraudulent scheme, all defendants being partners in crime, were responsible for the mailing. Tincher v. United States, 4 Cir., 11 F.2d 18; Hart v. United States, 5 Cir., 112 F.2d 128.

■ ■■■■ Under Section 215 of the Criminal Code, the mail fraud statute, it is sufficient to charge and prove that there was a scheme to defraud; that the mails were used or caused to be used in furtherance of the scheme; and that the scheme was one which "reasonably contemplated the use of the mails". A careful review of the evidence in this rather lengthy record discloses that the government proved the essential elements of the offenses charged, and that there was no fatal variance between the charges and the proof. Spivey v. United States, 5 Cir., 109 F.2d 181; Corbett v. United States, 8 Cir., 89 F.2d 124; Guardalibini v. United States, 5 Cir., 128 F.2d 984; United States v. Lowe, 7 Cir., 115 F. 2d 596; Hart v. United States, supra.

■■■■ Steiner attacks the sufficiency of the evidence to show the mailings alleged in the first two counts of the indictment, and further alleges that for purposes of venue there was no proof that the letter in the second count was mailed in New Orleans. The statement forming the basis of the first count was introduced in evidence. It was on the billhead of "Steiner and Stein", and was addressed to Longino & Collins, 3801 Tulane Avenue, New Orleans, La. The witness R. K. Longino produced the letter from his files, and testified that the statement was found with the stamped and postmarked envelope pinned to it. The bill bore date of December 31, 1938, and the envelope bore a postmark dated January 4, 1939. The witness Hugh M. Wilkinson, to whom Steiner had revealed the details of the scheme, and who had discussed a similar statement with Steiner, testified that Steiner had said that when a customer failed to pay the agreed fee, "Stewart himself would mail this bill on the billhead of Steiner and Stein * * *." The collection letter forming the basis of the second count was written to Intertype Corporation, 360 Furman Street, Brooklyn, New York. The letter was typed for Steiner by his secretary; it requested payment of the account "by return mail". The letter bore date of February 12, 1938, and was received in the New York office of Intertype two days later on February 14, 1938. An officer and an employee of Intertype Corporation testified to the manner of handling mail in the New York office, and that this letter was received by Intertype Corporation in due course through the mail. Although circumstantial in character, the proof concerning the mailing of the billhead and letter was sufficient to warrant submission of the question of mailing to the jury, and to establish that the letter to Intertype Corporation was in fact mailed at New Orleans. Cf. Corbett v. United States, 8 Cir., 89 F.2d 124; United States v. Baker, 2 Cir., 50 F.2d 122.

No contention is urged concerning the sufficiency of proof of the mailings charged in counts 4, 5 and 6 of the indictment.

It is contended that the testimony of the witness Hugh M. Wilkinson should have been excluded as being based on statements made to him by Steiner at a time when the relationship of attorney and client existed, and that, therefore, such statements were privileged and inadmissible. When the objection was made below, the jury was retired and the court proceeded to hear evidence bearing upon the relationship existing between Steiner and Wilkinson at the time the statements were made. The evi-

dence was in sharp conflict: Steiner saying that he consulted Wilkinson as an attorney, and Wilkinson saying that there was no attorney and client relationship. Wilkinson testified that he was a member of the Board of Governors of the Louisiana Bar Association; that Steiner came to him and told him that he was involved in trouble and wanted to resign from the practice of law; and that Steiner revealed the tax reduction scheme in detail. Having heard the testimony of Steiner, Wilkinson, and other witnesses, the trial court found that the relationship of attorney and client had not been shown and that the evidence definitely established that no such relationship existed between Steiner and Wilkinson at any time. Accordingly, Wilkinson was allowed to testify.

The fact that one is a lawyer does not disqualify him as a witness, for he, like any other person, may testify to any competent facts except those which came to his knowledge by means of confidential relations with his client. The existence of that relationship is a question of fact to be inquired into by the court preliminary to the admission or rejection of the proffered testimony. Here the preliminary inquiry was properly conducted and there was no error in the court's ruling allowing Wilkinson to testify. Smale v. United States, 7 Cir., 3 F.2d 101; Underhill's Criminal Evidence, 4th Ed., §§ 333, 334, 335; Wharton's Criminal Evidence, 10th Ed., § 497; Wigmore on Evidence, 3rd Ed., Vol. VIII, § 322, pp. 626-7.

There is no merit in the contention that the statements made by Steiner to Wilkinson constituted an involuntary confession made as a result of "promises, inducements, and hopes of reward". Wilkinson merely offered to lend his personal influence to secure leniency for Steiner. Wilkinson was not a law enforcement officer. Steiner was not in custody or under arrest, and no force, coercion, or duress was used to procure the statements. The statements were voluntarily made and were admissible in evidence. Furthermore, the court did not abuse its discretion in restricting cross-examination of Wilkinson regarding political matters.

Steiner further contends that he was denied the right of public trial in that legal matters with reference to the conduct of the trial were argued by government and defense counsel "in sotto voce at the bench in full view of the jury, but out of hearing of the defendant and the public". At the beginning of the trial the judge announced that the jury would be retired only in the event of extended argument on legal matters, and that other arguments on objections would be made by counsel at the bench. No objection was interposed by counsel to this practice. As the trial progressed numerous brief arguments were had at the bench out of hearing of the jury. Steiner's counsel participated in many of the conferences, and Steiner was always present in the court room when such conferences were held. Neither he nor his counsel complained or made objection at any time to the practice, and we think it clear that he was in no wise prejudiced. Both he and his counsel were satisfied with the procedure at the trial, and the assignment of error and the contention on the point seems to be nothing more than an afterthought by which fair conduct, in which they acquiesced and participated, is sought to be distorted into impropriety and alleged prejudicial error. The assignment is wholly without merit. See Johnson v. United States, 63 S.Ct. 549, 87 L.Ed. ——, decided February 15, 1943.

Complaint is made of the fact that the trial judge questioned certain witnesses during the trial. Many of the questions propounded by him were helpful in developing the facts of the case. He showed no partiality in his questioning and did not assume the role of prosecutor, a practice condemned in Adler v. United States, 5 Cir., 182 F. 464; cf. Moore v. United States, 5 Cir., 123 F.2d 207. At times the court's questions were helpful in bringing forth answers altogether favorable to Steiner and his co-defendants. In fact, the questions propounded did much to develop facts which led to exclusion of certain evidence and the consequent abandonment and withdrawal of the third count of the indictment. Moreover, the court was careful to instruct the jury that they were the sole judges of the facts, and that they were not to infer from his questioning that he had views one way or the other concerning the guilt or innocence of the defendants. The questioning of witnesses by the court did not constitute error. Moore v. United States, 5 Cir., 132 F.2d 47; United States v. Lee, 7 Cir., 107 F.2d 522.

The evidence made a case for the jury, and the court properly refused to grant the motion for a directed verdict. After a careful review of the record we

find no reversible error in the rulings of the court as to the admission or exclusion of evidence, including admission of duly authenticated photostatic copies of income tax returns. In the charge the court fully and fairly stated the law applicable to the case, and with care and prudence cautioned the jury not to be influenced by the fact that the defendants, as they had a constitutional right to do, elected not to take the stand to testify in their own behalf.

No reversible error appears and the verdict is supported by the evidence. The judgment is affirmed.

HUTCHESON, Circuit Judge (specially concurring).

I agree with my associates that the record leaves in no doubt that appellant and his confederates did, as the indictment charges, devise a scheme to defraud, "the State of Louisiana, the City of New Orleans, the Orleans Parish School Board, the Board of Commissioners of the Orleans Levee District, and Agencies of the State of Louisiana and of the City of New Orleans, and the taxpayers of the State of Louisiana and of the City of New Orleans". I agree with them, too, that the evidence supports the finding that the indictment letters were mailed as charged, that it was not error to receive Wilkinson's testimony, that there was no prejudicial error in the complained of conduct of the trial judge, and that if the mails of the United States were used for the furtherance of the scheme, the judgment should be affirmed.

Appellant, reads the indictment as not including within those to be defrauded by the scheme the taxpayers to whom the bills were sent. He argues that under the rule applied, in Stapp v. United States, 5 Cir., 120 F.2d 898, and Spillers v. United States, 5 Cir., 47 F.2d 893, to reverse, and in Hart v. United States, 5 Cir., 112 F.2d 128, to affirm, a conviction, the bills mailed to the clients after the reductions had been secured were not mailed in furtherance of the scheme because, a scheme to defraud the taxing agencies alone, it had already been consummated.

I cannot agree with this reading of the indictment. I think it clear that "the taxpayers of the State of Louisiana and of the City of New Orleans", alleged in the indictment as victims of the scheme, were the taxpayer clients, victimized by paying for fraudulent services which they had been led to believe were to be honest and faithful services.

A reading of the indictment on page 5 of the record leaves this in no doubt. It is there alleged that the "said defendants * * * would pretend and represent that they were engaged in the legitimate business of procuring and obtaining for taxpayers reductions in their tax assessments on real and personal property on the official tax record * * * which said assessments the said defendants * * * would pretend, represent and claim to the said taxpayers were erroneous, excessive and improper; that they would approach and solicit taxpayers to whom they would represent, pretend and claim that they would appear before the Louisiana Tax Commission as the authorized representatives of said taxpayers for the purpose of establishing and obtaining fair assessments on the real and personal property of said taxpayers, * * * that it was a part of said scheme and artifice to defraud, that the defendants * * * would pretend to taxpayers whom they would solicit and approach that they would employ only legitimate and honest means in effecting such reductions in assessments; that the defendants * * * would obtain contracts * * * which would provide for the payment to them as compensation for their services in obtaining any such reductions in assessments contingent fees of 50 percent of the amount of taxes saved by such taxpayers by reason of any such reduction."

Though, therefore, I cannot agree with the holding of the majority that, taking as correct the view that the scheme, as alleged in the indictment, was one to defraud the taxing agencies alone, and the victims of it were those agencies and the other taxpayers whose assessments had not been reduced, the indictment letters must still be held to have been sent in furtherance of that scheme, I do agree that the judgment must be affirmed. For the indictment charges a scheme to defraud defendant's clients as well as the public, and the sending of the indictment letters was not only in furtherance of, it was essential to, the scheme to defraud.