United States Court of Appeals,

Eleventh Circuit.

No. 95-3130.

UNITED STATES of America, Plaintiff-Appellant,

v.

Vicki LOPEZ-LUKIS a.k.a. Vicki Lopez-Wolfe and Sylvester Lukis,
Defendants-Appellees.

Jan. 6, 1997.

Appeal from the United States District Court for the Middle
District of Florida. (No. 95-4-CR-FTM-21), Ralph W. Nimmons, Jr.,
Judge.

Before TJOFLAT, Circuit Judge, and RONEY and CAMPBELL[*], Senior
Circuit Judges.

TJOFLAT, Circuit Judge:

Sections 1341 and 1346 of Title 18 of the United States Code,

the federal mail fraud statutes, make it unlawful to deprive the

electorate of a governmental office holder's "honest services."[1]

This interlocutory appeal presents the question of whether these

statutes make criminal a scheme in which a county commissioner, in

addition to selling her own votes to a lobbyist, takes steps to

ensure that a majority of commissioners vote for projects favored

by the lobbyist. In this mail fraud prosecution, the district

---

[*]Honorable Levin H. Campbell, Senior U.S. Circuit Judge for
the First Circuit, sitting by designation.

[1]Section 1341 proscribes use of the mails as part of a
"scheme or artifice to defraud." 18 U.S.C. § 1341 (1994).
Section 1346 defines "scheme or artifice to defraud" to include
"a scheme or artifice to deprive another of the intangible right
of honest services." 18 U.S.C. § 1346 (1994). While these
statutes are clearly not limited to schemes involving
governmental officials, they frequently are used to combat
governmental corruption. *See, e.g., United States v. Waymer,* 55
F.3d 564 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct.
1350, 134 L.Ed.2d 519 (1996).

court, ruling on a defense motion *in limine,* answered this question in the negative and struck the portion of the indictment alleging that the defendants' scheme to defraud included an attempt to control the composition of the commission. The court's order also precluded the Government from introducing evidence that would establish this objective. The Government appealed; we now reverse.

## I.

Defendant Vicki Lopez-Lukis is a former member of the five-person Board of County Commissioners for Lee County, Florida ("the Board"). She served on the Board from her election to office in November 1990 until her resignation in January 1993. Defendant Sylvester Lukis is a lobbyist who represents clients before the Board. The defendants engaged in a romantic relationship during Lopez-Lukis' term in office and were married subsequent to the events giving rise to this case.[2]

## A.

Lopez-Lukis and Lukis were indicted by a federal grand jury on March 10, 1995. Count one of the indictment, which is supplemented by a bill of particulars, charges both defendants with violating the federal mail fraud statutes, 18 U.S.C. §§ 1341, 1346.[3] The

---

[2]Presumably due to name changes related to different marriages, Lopez-Lukis is also referred to in the record as Ms. Lopez-Wolfe, Ms. Lopez-Wolfe-Lukis, and Ms. Lukis. For the sake of clarity, we refer to her simply as "Lopez-Lukis."

[3]Of the remaining ten counts, the defendants were indicted together in eight counts of using a facility in interstate commerce to commit bribery in violation of 18 U.S.C. § 1952 (1994), and each defendant was indicted separately for bribery in violation of 18 U.S.C. § 666 (1994). Only the mail fraud count is before us in this appeal.

indictment alleges that during Lopez-Lukis' term on the Board, the defendants devised a scheme "to deprive the citizens of Lee County and the State of Florida of their intangible right to [Lopez-Lukis'] honest services ... in her official capacity as Lee County Commissioner." Specifically, the defendants are charged with using Lopez-Lukis' position for the benefit of Lukis' clients, two of whom—Ogden Projects, Inc., and Goldman-Sachs and Company—are identified by name in the indictment.[4]

The indictment alleges that Lukis paid Lopez-Lukis in order to influence her actions as a county commissioner and that, to facilitate their scheme, the defendants concealed their "monetary and intimate relationship" from the public. More important for this appeal, however, paragraph fourteen of the mail fraud count alleges that the defendants tried to prevent Susan Anthony, a candidate for the Board who opposed the interests of Lukis' clients, from unseating Lopez-Lukis' fellow Board member John Manning in the 1992 primary election.[5] The alleged purpose of this

---

[4]In its bill of particulars ordered by the district court, the Government contends that the defendants helped Ogden Projects, a contractor, retain its contract to construct a multimillion-dollar waste-to-energy incinerator in Lee County and ensure that the Board would allow the project to move forward. Lukis and Lopez-Lukis were apparently successful in their efforts on behalf of Ogden Projects: a final notice to proceed with construction of the project was issued by the Board on October 21, 1992.

The defendants also enjoyed apparent success in promoting the interests of Goldman-Sachs, a brokerage house. The Board voted to select Goldman-Sachs to perform underwriting work for public projects in Lee County, including an airport.

[5]The indictment alleges that Anthony ran as "an anti-incinerator candidate"; in other words, she opposed the incinerator project being undertaken by Lukis' client, Ogden

endeavor was to control the composition of the Board to ensure that it would continue to vote in favor of the interests of Lukis' clients.[6]

To secure Manning's victory, the defendants allegedly threatened that, unless she withdrew from the race, they would disseminate to several media organizations a videotape that depicted Anthony, who was campaigning as a family-values candidate, engaging in an extramarital affair. The Government's proffer to the district court alleges that both defendants told Manning that they were preparing videotapes that would "derail" Anthony's campaign. When Anthony did not withdraw from the race, the defendants distributed the videotape to the media. Manning subsequently defeated Anthony in the primary's run-off election.[7] We refer to this series of events collectively as the "videotape incident."[8]

_____

Projects. According to the proffer made by the Government at the hearing on the defendants' motion *in limine,* Lukis and his clients supported Manning in the election.

[6]Paragraph 14 states that the defendants attempted to keep Anthony off the Board to "corruptly affect the composition and work of the Board of Lee County Commissioners ... to promote, foster, further, facilitate and enlarge the scheme." Although the indictment is inartfully drawn and the Government has had considerable difficulty articulating the nature of this allegation, we read ¶ 14 as charging that the defendants attempted to manipulate the composition of the Board in order to control a majority of votes.

[7]In the primary's main election on September 1, 1992, Anthony received the most votes, but because of a third candidate, she did not command a majority. The next day the local newspaper ran a story about the videotape. Manning soundly defeated Anthony in the run-off on October 1, 1992.

[8]The parties have offered different explanations of the events surrounding the videotape incident, including how and why the videotape was made and what motivated Lopez-Lukis to issue

Early in the case, the defendants moved to strike paragraph fourteen from the indictment. As grounds for their motion, the defendants argued that the allegations of paragraph fourteen were irrelevant to the crime charged (i.e., mail fraud under sections 1341 and 1346), that their conduct described in that paragraph was protected by the First Amendment, and that litigation of its allegations would "needlessly complicate and lengthen the process of trying this case." The district court summarily denied their motion on June 20, 1995.

The defendants later moved *in limine* to exclude "any and all evidence relating to any surveillance videotape of Susan Anthony" on the same grounds as they presented in support of their earlier motion to strike. The district court heard this motion on September 1, 1995. Ruling from the bench on September 5, the day before the trial was to commence, the court concluded that because the videotape incident did not involve Lopez-Lukis' official duties as county commissioner, it was not the sort of conduct proscribed by sections 1341 and 1346.[9] In granting the defendants' motion to

---

the threat. While these explanations may or may not be probative at trial, depending on how the facts are developed, they are irrelevant for purposes of this appeal. All that is important for present purposes is that Lopez-Lukis threatened to disseminate the tapes if Anthony did not abandon her candidacy, that the defendants informed Manning of her threat, and that they released the tapes after she refused to drop out of the race.

[9]As the court stated:

> Unlike other elements of the scheme or artifice which clearly allege methods and means by which services in her official capacity were affected or sought to be affected, such as the payment of money to influence her in her acts or decisions in her official

suppress all evidence related to the videotape incident, the court vacated its earlier order denying the motion to strike and granted that motion as well, striking paragraph fourteen from the indictment. The Government immediately announced that it would appeal the court's ruling; it took this interlocutory appeal[10] the

> capacity, her participation or complicity in either secretly or openly attempting to persuade a candidate for a seat on the County Commission to withdraw by threatening to expose such person to disgrace cannot, by any reasonable construction of the subject mail fraud statute, be regarded as actions or conduct in her official capacity as a County Commissioner. Her duties and responsibilities as a County Commissioner simply do not include the determination as to who is elected to serve on the County Commission.

[10]Interlocutory district court orders, such as the one involved in this case, ordinarily are not reviewable until the court has entered final judgment. *See* 28 U.S.C. § 1291 (1994). We have jurisdiction over this interlocutory appeal, however, under 18 U.S.C. § 3731, which provides that "[a]n appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence ... in a criminal proceeding." 18 U.S.C. § 3731 (1994). While the part of the district court's order striking ¶ 14 from the indictment does not fall within this statutory exception, "pendent jurisdiction and the doctrine of judicial economy permit us to exercise jurisdiction over related claims when other claims are properly reviewable." *Hill v. Dekalb Reg'l Youth Detention Ctr.,* 40 F.3d 1176, 1183 (11th Cir.1994).

> Although the Supreme Court rejected our use of pendent party appellate jurisdiction in *Swint v. Chambers County Comm'n,* --- U.S. ----, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), *Swint* does not bar jurisdiction in this case. That case dealt only with the use of pendent jurisdiction over a nonappealable issue involving parties different from those involved in the appealable issue. *Swint* was a civil rights case based on alleged misconduct by local police. The defendants in that case included three individual police officers and the local county commission. The district court had denied summary judgment motions by all defendants, and all defendants sought interlocutory appellate review. The individual officers' motions for summary judgment were based on qualified immunity; thus, we had immediate appellate jurisdiction over the denial of these motions under the narrow exception to the final judgment rule laid out in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86

next day, the day the trial was to begin.  The district court
stayed further proceedings in the case pending the outcome of this
appeal.

We hold that the district court misconstrued section 1346 and
improperly narrowed the scope of the scheme alleged by the
Government.  We therefore reverse its order striking paragraph
fourteen from the indictment and excluding all evidence relating to
the videotape incident.

---

L.Ed.2d 411 (1985).  *Swint v. City of Wadley,* 5 F.3d 1435,
1448-49 (11th Cir.1993), *modified,* 11 F.3d 1030 (11th
Cir.1994), *vacated in part sub nom.  Swint v. Chambers
County Comm'n,* --- U.S. ----, 115 S.Ct. 1203, 131 L.Ed.2d 60
(1995). We invoked pendent jurisdiction to review the order
denying the county commission's summary judgment motion,
even though it was an interlocutory order over which we
would normally not have immediate appellate jurisdiction
because it did not raise the defense of qualified immunity.
*Swint,* 5 F.3d at 1449-50. It was this use of pendent
jurisdiction that the Supreme Court rejected. *Swint*, ---
U.S. at ---- - ----, 115 S.Ct. at 1208-12.

The Court explicitly refrained, however, from
"definitively or preemptively" rejecting the use of pendent
appellate jurisdiction over related claims.  It suggested
that pendent appellate jurisdiction may be appropriate when
a nonappealable decision is "inextricably intertwined" with
an appealable decision or when "review of the former
decision [is] necessary to ensure meaningful review of the
latter."  *Id.* at ----, 115 S.Ct. at 1212;  *see also Johnson
v. Clifton,* 74 F.3d 1087, 1091 (11th Cir.1996), *petition for
cert. filed,* --- U.S. ----, 117 S.Ct. 51, 136 L.Ed.2d 15
(1996) (No. 95-1743).

Because the district court's order striking the
indictment is so closely related to its exclusion of the
Government's evidence, we are confident that our application
of pendent jurisdiction is proper in this case.  Review of
the order striking ¶ 14 from the indictment satisfies both
the "inextricably intertwined" and "necessary to ensure
meaningful review" tests.  Both orders resulted from the
same determination—i.e., that the videotape incident cannot
be used to support a charge of mail fraud under §§ 1341 and
1346.  Furthermore, review of the evidentiary ruling
necessarily implicates review of the order striking ¶ 14
from the indictment.

The district court apparently based its decision that the videotape incident could not be used to prove mail fraud not on the question of factual relevance, but on the question of whether this conduct "fit" within the parameters of section 1346.[11] We review this question of statutory interpretation *de novo.* *See National Coal Ass'n v. Chater,* 81 F.3d 1077, 1081 (11th Cir.1996).

A proper understanding of the scheme alleged is essential to the resolution of this appeal. The heart of count one is an allegation of a broad bribery scheme: Lukis paid Lopez-Lukis for political favors. The present controversy centers on exactly what Lukis' money bought. The indictment alleges that Lukis bribed Lopez-Lukis because he thought that she would give him two things:

---

[11]The district judge stated:

> While [the videotape incident] is, indeed, reprehensible and illegal, it is simply outside the framework of the subject mail fraud charge under Section 1346.
>
> The Court has simply not been able to fit this transaction into the mail fraud scheme which is the subject of Count 1. It stands out as a peculiarly inappropriate part of this mail fraud count.

The district court also noted that the mailing upon which the mail fraud charge is based was sent almost a year before the videotape incident and shared "no connection" with the videotape incident. The degree to which the district court considered this to be determinative is unclear, but to the extent that it relied on this observation as grounds for excluding the evidence, it was in error. There is no requirement that every piece of evidence of the scheme to defraud somehow relate to the mailing. The only requirement is that the mailing be related to some "step in the plot." *United States v. Waymer,* 55 F.3d 564, 569 (11th Cir.1995) (quoting *Schmuck v. United States,* 489 U.S. 705, 711, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989)), *cert. denied,* --- U.S. ----, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996).

(1) her vote on key matters and (2) control of the Board—that is, her influence to deliver a majority of the Board's votes on those matters. The central question in this appeal is whether sections 1341 and 1346 reach such a bribery scheme.

We believe the answer to this question should be self-evident: if it is illegal for a public official to sell her own vote, it also must be illegal for her to sell her vote *and* her influence over other's votes as well. After all, because the Board consists of five members and presumably acts by majority vote, it would do Lukis little good if all that his money purchased was Lopez-Lukis' single vote.

In this section, we first explain why a scheme by a legislator to deliver control of a majority of legislative votes for a price constitutes a scheme to defraud, as defined by sections 1341 and 1346. We then address the district court's reasoning and demonstrate why it is erroneous. Finally, we examine the allegations against the defendants and show why they manifest an attempt to deliver control of the Board.

A.

A brief review of the mail fraud statutes and their interpretation by the courts is helpful to understanding why they proscribe a scheme for a legislator to sell control of a legislative body when that scheme includes use of the mails. To establish a violation of sections 1341 and 1346, the Government must prove that the defendants "(1) intentionally participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme or artifice." *Waymer,* 55 F.3d at

568 (citing *United States v. Hooshmand,* 931 F.2d 725, 731 (11th Cir.1991)).

At common law, the prohibition of fraud generally was regarded as protecting property rights only. *See McNally v. United States,* 483 U.S. 350, 358 n. 8, 107 S.Ct. 2875, 2881 n. 8, 97 L.Ed.2d 292 (1987). As early as the 1940s, however, federal prosecutors seeking to combat government corruption began using section 1341 to prosecute schemes to defraud the public of the honest and faithful services of government officials. *See, e.g., Shushan v. United States,* 117 F.2d 110 (5th Cir.), *cert. denied,* 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941). In the 1987 *McNally* case, the Supreme Court rejected this practice by holding that section 1341 was "limited in scope to the protection of property rights" and therefore did not prohibit schemes to defraud the citizens of their intangible right to honest and impartial government. *McNally,* 483 U.S. at 360, 107 S.Ct. at 2882.

Section 1346 was enacted in 1988 to revive the "honest-services" theory of mail fraud. We have recognized that Congress passed this provision to overrule *McNally* and reinstate prior law. *See Waymer,* 55 F.3d at 568 n. 3. Consequently, we consider pre-*McNally* cases as persuasive authority in evaluating the scope of honest-services fraud. Both the former Fifth Circuit[12] before *McNally* and this circuit after *McNally* consistently have held that schemes by government officials to deprive the public of

---

[12]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

its right to their honest services, when a mailing is involved, constitute mail fraud. *See, e.g., United States v. Castro,* 89 F.3d 1443 (11th Cir.1996); *Waymer,* 55 F.3d 564; *Steiner v. United States,* 134 F.2d 931 (5th Cir.), *cert. denied,* 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721 (1943); *Shushan,* 117 F.2d 110.

The crux of this theory is that when a political official uses his office for personal gain, he deprives his constituents of their right to have him perform his official duties in their best interest. Elected officials generally owe a fiduciary duty to the electorate. *See Shushan,* 117 F.2d at 115 (noting that "[n]o trustee has more sacred duties than a public official"). When a government officer decides how to proceed in an official endeavor—as when a legislator decides how to vote on an issue—his constituents have a right to have their best interests form the basis of that decision. If the official instead secretly makes his decision based on his own personal interests—as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest—the official has defrauded the public of his honest services. *See United States v. Sawyer,* 85 F.3d 713, 724 (1st Cir.1996) ("The cases in which a deprivation of an official's honest services is found typically involve either bribery of the official or her failure to disclose a conflict of interest, resulting in personal gain.").

The appellees concede that a county commissioner commits honest-services fraud when she sells her vote. It is no less a violation of sections 1341 and 1346, however, for that commissioner, in addition to selling her vote, to take steps to

ensure that a majority of commissioners vote with her. *See generally Shushan,* 117 F.2d 110 (affirming mail fraud convictions for broad scheme involving bribery of two members of board of commissioners who attempted to influence actions of entire board). In both scenarios, the commissioner deprives her constituents of their right to her honest services by deciding how to vote based on her own interests. The second scenario simply makes this deprivation more concrete. In addition to depriving her constituents of their right to her honest services, she seeks to ensure that the actions the Board takes are in her own best interests instead of the best interests of the public.[13]

One commissioner's vote, without more, does not guarantee that a particular legislative proposal favored by the briber will succeed. Any such measure generally requires a majority vote from the commission. While we do not mean to suggest that the bribery of a single official for a vote cannot sustain a conviction for mail fraud,[14] that an official took steps to ensure that her

---

[13]This analysis does not suggest that, under such a scenario, the other commissioners are necessarily depriving *their* constituents of the right to honest services. It is entirely possible that they will decide that proposals that she supports are in fact in the best interest of the electorate and vote accordingly. In this case, only the bribed commissioner would be depriving her constituents of their right to honest services.

That the result of the bribed commissioner's vote actually benefits the electorate would not change the fraudulent nature of her conduct. Sections 1341 and 1346 do not address the wisdom or results of a legislative decision; rather they concern the manner in which officials make their decisions.

[14]To the contrary, as we stated long ago, "[t]he fact that the official who is bribed is only one of several and could not award the contract by himself does not change the character of the [fraudulent] scheme." *Shushan,* 117 F.2d at 115.

fraudulent scheme would yield results makes the case against her more compelling. Such actions increase the likelihood that the scheme to defraud the electorate of their right to the commissioner's honest services will bear fruit. Surely section 1346 was intended to prohibit just this sort of conduct, and today we hold that it does.

B.

The district court construed section 1346 to proscribe conduct aimed at obtaining an individual legislator's vote, but no more. By excluding evidence necessary to prove the existence of a larger scheme, it narrowed the scheme's scope from an attempt to obtain control of the Board to an attempt to procure a single vote. This narrow interpretation of the mail fraud statutes was erroneous.

The court ruled that the videotape incident was outside the scope of section 1346 because it did not involve Lopez-Lukis' official duties. As the court noted, "[Lopez-Lukis'] duties and responsibilities as a County Commissioner simply [did] not include the determination as to who is elected to serve on the County Commission." Even if we assume that honest-services fraud involving a public official can be predicated only on the

_____

Several scenarios may be imagined in which a potential briber might only need a single vote. For example, the bribed official might chair a committee and have power to decide which issues come before the body for a vote and the manner in which they are addressed. Similarly, if passage of particular legislation only required a single additional vote—that is, a number of officials already supported the legislation for their own reasons—buying that extra vote alone would be desirable.

performance of services in an official capacity,[15] the court's ruling misconceives the nature of the scheme alleged in the indictment.

The object of the alleged scheme was not to keep Anthony off the Board or otherwise determine who would serve on the Board. Rather, the goal was for Lopez-Lukis to receive personal benefits in exchange for her efforts to secure Board action that favored the interests of Lukis' clients. The videotape incident is relevant for at least two reasons. First, because the incident was allegedly designed to keep Manning, who would likely vote for projects favored by Lukis' clients, on the Board, it tends to show that Lopez-Lukis had an agenda to serve the interests of Lukis' clients instead of the interests of her constituents.

Second, the videotape incident also demonstrates that the scheme embraced more than just the compromising of one vote on the Board. The scheme involved efforts to influence decisions of the entire Board. Lopez-Lukis' single vote, without more, could not carry out the objectives of the defendants' scheme to procure Board action favorable to Lukis' clients. To pass, any measure favorable to Lukis' clients required a majority of the Board's votes—that is, the votes of Lopez-Lukis and at least two others. To the extent she exercised influence over the composition and voting of the Board, Lopez-Lukis made the deprivation of her constituents' right to her honest services more complete and profitable. In this regard, the videotape incident may be viewed merely as a means to

---

[15]Because it is not dispositive in this case, we decline to rule on this issue.

an end.  Thus, the Government does not seek to predicate mail fraud liability on the videotape incident itself;  it is merely attempting to use the incident as circumstantial proof of a broad scheme to defraud.

While we need not and do not decide the issue, it may be true that the videotape incident, standing alone, could not support criminal liability under section 1346 because it did not directly involve conduct in Lopez-Lukis' official capacity.  If true, this proposition would not mean, however, that the Government cannot introduce such evidence to demonstrate a broad scheme to control and obtain favorable votes from the Board.  Because the videotape incident tends to show both that Lopez-Lukis intended to benefit Lukis' clients instead of the public and that the scheme was more likely to succeed, it is clearly relevant to the charge of honest-services fraud and properly was charged in the indictment as part of her overall scheme.[16]

---

[16]For this reason, two other arguments that the appellees stress in their brief are misguided.  In addition to agreeing with the district court's official-duty analysis, the appellees offer two other, alternative arguments that would justify affirming its order even though the district court did not address them.  They first point to the line of cases beginning with *Fasulo v. United States*, 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443 (1926), which hold that extortion cannot be the basis for a mail fraud conviction.  The appellees argue that the videotape incident, as alleged, constitutes extortion and thus is not covered by § 1346.  Second, they argue that their actions constitute political speech and thus deserve protection under the First Amendment.

Again, we need not decide whether the videotape incident alone can support a mail fraud conviction.  The government is seeking to punish the defendants not because they tried to keep a candidate from being elected to the Board, but because they used Lopez-Lukis' office for personal benefit.  Evidence of the videotape incident tends to show both that Lopez-Lukis intended to ensure that the

Any hard and fast rule that the government cannot use a public official's conduct that is not in an official capacity as evidence of a scheme to defraud the public of an official's honest services would impermissibly narrow the scope of section 1346 and "would belie a clear congressional intent to construe the mail fraud statute broadly," *Castro,* 89 F.3d at 1456. Therefore, we decline to read such a rule into the statute.

C.

The appellees argue in their brief that regardless of whether the district court erred in its interpretation of section 1346, we should affirm its ruling because the Government failed to proffer any evidence that keeping Anthony off the Board would further the interests of Lukis' clients. While any implication that the videotape incident was part of a scheme to control the Board might

---

Board would vote for the interests of Lukis' clients and that their scheme was likely to succeed.

Even if the videotape incident could not serve as a proper independent basis for imposing criminal liability—either because of the rule set down in *Fasulo* or because of First Amendment concerns—the Government may use it as evidence that the defendants engaged in a broad scheme to defraud the public. *Cf. Huff v. United States,* 301 F.2d 760, 765 (5th Cir.) ("[F]raud and extortion are not mutually exclusive. The mere fact that extortion may constitute one aspect of the transaction does not insulate the fraudulent ... plan from prosecution as a scheme to defraud.") (interpreting wire fraud statute, 18 U.S.C. § 1343), *cert. denied,* 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962); *Waymer,* 55 F.3d at 569 ("Assuming *arguendo* that certain marginal applications of section 1346 would impermissibly intrude on First Amendment rights, we hold that such potential problems with section 1346 are insubstantial when judged in relation to the statute's plainly legitimate sweep.").

hinge to some degree on such evidence,[17] the appellees characterization of the Government's evidence is not supported by the record. The Government has offered to prove several facts that could persuade a rational factfinder that Lopez-Lukis could control a majority of Board votes more easily with Manning, instead of Anthony, on the Board.

For example, the Government has proffered that Lopez-Lukis told Manning that she was going to "derail" Anthony's campaign against him. This allegation, if proven, would support an inference that Manning owed a political debt to Lopez-Lukis and likely would vote with her on key issues. Thus, Lopez-Lukis could better obtain votes favorable to Lukis' present or future clients with Manning on the Board.

Moreover, the record is replete with evidence that, without Anthony, the Board would be more likely to vote in favor of the interests of at least two of Lukis' current clients—Ogden Projects and Goldman-Sachs. First, the indictment specifically alleges that Anthony opposed Ogden Projects' incinerator project. Had she been elected, she posed a serious threat to the project.[18] Second, in

_____

[17]Of course, even without this kind of evidence a factfinder might infer that the defendants were trying to gain control of the Board to benefit Lukis' future clients. As a lobbyist, Lukis could certainly use control of the Board as a valuable asset in soliciting additional clients.

[18]*See supra* note 4 (describing this project in greater detail). The appellees contend that because the final notice to proceed on the project had been issued before Anthony could have taken office, Anthony could have no impact on the project. This contention is flawed. Had she been elected, she could have voted to terminate the project or cause problems throughout construction. The fact that she was running on an "anti-incinerator" platform certainly suggests she would have done everything in her power to halt or delay the project.

its proffer the Government offered to prove that Lukis helped raise funds for Manning's campaign and that officials from Goldman-Sachs and Ogden Projects contributed to Manning's campaign fund. This evidence suggests that Manning would further the interests of Lukis' clients if re-elected, or at least that Lukis' clients assumed he would. In short, keeping Anthony off the Board formed an important step in effectuating the defendants' alleged scheme to sell control of the Board.[19]

### III.

For the foregoing reasons, we REVERSE the district court's grant of the defendants' *in limine* motion seeking the exclusion of the evidence relating to the videotape incident and its order striking paragraph fourteen from the indictment. We REMAND this case to the district court for further proceedings consistent with this opinion.

SO ORDERED.

---

[19]The appellees argue in their brief that the risk of prejudice and undue delay substantially outweighs any relevance the videotape incident has to the mail fraud charge. Thus, they contend that any evidence concerning the videotape incident should be excluded under Federal Rule of Evidence 403. Because the trial court's ruling appears to be based on its interpretation of § 1346 and not on considerations of relevance and prejudice, we refrain from ruling on this issue. However, as our analysis of the videotape incident suggests, the value of this evidence may be sufficiently probative to render exclusion under Rule 403 an abuse of discretion.