[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11066
_____

D.C. Docket No. 3:10-cr-00023-TCJ-TEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TONY DEVAUGHN NELSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 13, 2013)

Before WILSON and HILL, Circuit Judges, and HUCK,[*] District Judge.

HUCK, District Judge:

_____

[*] Honorable Paul C. Huck, Senior United States District Judge for the Southern District of Florida, sitting by designation.

Tony Nelson, a former member of the Jacksonville Port Authority's (JaxPort['s]) board of directors, was convicted in the Middle District of Florida for honest-services mail fraud under 18 U.S.C. §§ 1341 and 1346, federal funds bribery under 18 U.S.C. § 666(a)(1)(B), conspiracy to commit mail fraud and bribery under 18 U.S.C. § 371, and several other crimes predicated on these offenses.  On appeal, he challenges his convictions on three grounds.  First, Nelson argues that the fraud and bribery statutes under which he was convicted are unconstitutionally vague as applied in this case because they fail to describe the nature and scope of the fiduciary obligations owed by public officials to the public—i.e. they lack an "ascertainable standard" by which Nelson and the jury could have determined whether his conduct was unlawful.  Second, Nelson argues that he is entitled to a new trial because the district court improperly instructed the jury on what constitutes a "bribe" for purposes of his honest-services and federal funds bribery charges.  Finally, Nelson argues that the district court committed reversible error by admitting the testimony of JaxPort's director of procurement, Louis Naranjo, which he asserts allowed the jury to convict him on the basis of uncharged conduct.

Upon review of the parties' briefs and the record, and with the benefit of oral argument, we affirm.

2

**I.**

JaxPort is an independent agency and political subdivision of the State of Florida and is responsible for the development and maintenance of Jacksonville's public seaport terminals.  The agency is governed by a seven-member, all-volunteer board.  The Mayor of Jacksonville appoints four members, and the Governor of Florida appoints three others.  The board elects a chairman, who leads the board.  Board members serve four-year terms and may serve a maximum of two terms.  JaxPort has a staff of approximately 150 employees and several officers, including a chief executive officer, who reports to the board.

Nelson was appointed to the board in 2001 by Jacksonville Mayor John Delaney and served as chairman of the board from March 2006 until September 2007.  He remained a member of the board until resigning in 2008 amid allegations that he solicited and accepted bribes from one of JaxPort's private dredging contractors, Subaqueous Services, Inc. ("SSI"), and its owner, Lance Young.  These allegations, which we summarize here, led to an FBI investigation and ultimately to this criminal action.[1]

Nelson was introduced to Young in the fall of 2005 by another JaxPort board member, Marty Fiorentino, at Young's Jacksonville Jaguars luxury suite.  At the

---

[1] We recount the facts as the jury found them.  We also describe here certain undisputed facts that, while unnecessary to the jury's verdict, are otherwise relevant to this appeal.  Where helpful, such as where we recount a witness's characterization of events or a witness's testimony involving statements made to him or her by someone else, we indicate who testified to that fact.

time, Fiorentino, a Jacksonville attorney and lobbyist, was under contract with Young to lobby on behalf of SSI in the Jacksonville area. For these services, Young paid Fiorentino $5,000 per month. According to Nelson, Fiorentino told him that the City of Jacksonville's Deputy General Counsel and Co-Ethics Officer, Steven Rohan, advised Fiorentino that he could lobby on behalf of SSI so long as he abstained from voting on matters involving SSI or Young.

Following their initial meeting, Young and Nelson became friendly, speaking by telephone on a weekly basis and socializing regularly. Nelson was a frequent guest in Young's Jaguars suite, and whenever Young was in Jacksonville they would have dinner at Young's expense. Although they did not yet have a formal understanding that Nelson would help SSI with its business at JaxPort, Nelson offered Young advice on submitting bids for JaxPort projects. For example, Young testified that, in the fall of 2005, Nelson suggested that SSI include in its first bid proposal a provision for participation by "disadvantaged" contractors, which was supposed to improve the chances of SSI's bid being selected. Although JaxPort did not accept this initial bid, Nelson would credit the success of SSI's subsequent bids, at least in part, to this advice.

Around the same time, Nelson urged JaxPort staff to retain SSI for dredging work. Louis Naranjo, JaxPort's director of procurement, testified that in November 2005 JaxPort's chief financial officer, Ron Baker, asked Naranjo to

4

attend a meeting with Nelson at Nelson's downtown Jacksonville office.[2]

According to Naranjo, Nelson complained about the performance of JaxPort's

dredging contractor, SeaTech, and told Naranjo that he should cancel JaxPort's

contract with the company. Naranjo testified that he responded by telling Nelson

that he saw no reason to cancel the SeaTech contract and that, in any event, he did

not have such authority. In response, Nelson told Naranjo that if Naranjo could not

cancel the contract, Nelson would find someone else who could. Naranjo further

testified that Nelson told him that SSI was "ready to go and could do this work."

Meanwhile, Young grew frustrated because Fiorentino was, in Young's

view, not doing enough to help SSI at JaxPort. Young testified that Fiorentino was

"really good at introducing [him] to people" but "wasn't doing anything for

[him]"—"there was no movement on [his] problem." Young added that, in the

summer of 2006, when he told Fiorentino he was not going to renew their

agreement, Fiorentino suggested that he speak with Nelson, who by then was

chairman of the JaxPort board.

According to Young, when he expressed to Nelson his disappointment with

Fiorentino, Nelson responded that he was getting "twice as much" done for Young

and SSI than Fiorentino ever did. Young further testified that Nelson told him that

---

[2] As discussed below, Nelson argues that Naranjo's testimony concerning the content of this meeting, which predates the alleged conspiracy, should not have been allowed into evidence. This argument forms the basis for Nelson's third ground for reversal.

he "wanted to be on the payroll," which Young understood to be a solicitation for a bribe.

After considering Nelson's request and discussing the matter with his state-wide lobbyist, Frank Bernadino, Young arranged to retain Nelson as a "consultant" through Bernadino's company, the Wren Group, at a rate of $8,500 per month. To avoid making payments directly to Nelson, Young paid Nelson's fees to Wren Group, which in turn paid Nelson through Nelson's company, Ja-Ash, Inc. Regular payments were made in this fashion from August 2006 through the summer of 2007, after which time, according to Young, he and Nelson agreed that Nelson would be paid through a deferred, lump-sum payment. According to Young, this new arrangement was put in place because SSI had to discontinue all lobbying activities in anticipation of the sale of SSI to Orion Marine Group, which left Young without a method of paying Nelson through Wren Group. Young told Nelson that he would be paid in full following the sale of SSI. In accordance with their agreement, Young gave Nelson a check for $50,000 in March 2008.

The testimony presented at trial reflects that, although Nelson never voted on an SSI contract while receiving payments from the company, he was frequently called upon by Young to help SSI with various other matters before JaxPort. Young testified, for example, that he asked Nelson for his assistance in persuading JaxPort to approve a change order to one of SSI's dredging contracts. According

6

to Young, Nelson later reported that he made several phone calls to unspecified JaxPort staff members and assured Young that the change order would be approved. The change order, which was indeed approved in September 2007, added almost $150,000 of work to SSI's contract.

Young also testified that Nelson agreed to help SSI obtain early release of approximately $585,000 in "retainage" (a portion of the earned contract price withheld until project completion) under a contract with JaxPort. JaxPort's manager of contracts and administration, Elaine Varnot, corroborated this testimony, stating that she was instructed by JaxPort's director of finance and the project manager to release the retainage funds to SSI (through SSI's general contractor for the project), which she eventually did. Varnot added that, in her experience, the making of such an exception was unprecedented. Other examples of matters in which Nelson apparently intervened on SSI's behalf include instances where he requested that JaxPort increase the price of its contract with SSI to account for increased fuel costs (a request that was ultimately denied) and where he requested that SSI be paid on particular claims.

Nelson's relationship with Young and SSI did not go unnoticed. In response to complaints from other JaxPort vendors about the alleged conflict of interest, in February 2007, Baker called a private meeting with JaxPort staff to discuss the Nelson-SSI relationship. At that meeting, Baker directed JaxPort's ethics officer,

7

Linda Williams, to conduct an investigation. That same day, Nelson met with the City of Jacksonville's general counsel, Cindy Laquidara, to discuss the accusations. Laquidara testified that Nelson told her that he and SSI once submitted a joint bid for a project through the United States Army Corps of Engineers ("Corps"), but that the bid failed. Nelson did not disclose that he was also receiving payments from SSI for "consulting" services. Based on these representations, Laquidara sent an email to Nelson advising him that his relationship with SSI did not present any conflicts of interest; Nelson then forwarded the email to Baker. Nelson also denied having a business relationship with SSI or Young (beyond the Corps bid) in his conversations with Williams and others. Recordings of Nelson's meeting with Williams reflect that he denied ever receiving "a dollar, a penny, or a nickel" from SSI.

By February 2008, the FBI had begun intercepting Nelson's calls with Young.[3] In these recordings, Nelson and Young are heard discussing, among other things, Young's negotiations to sell SSI to Orion and how the new ownership would affect the level of access that Nelson was willing to provide the company at JaxPort. Nelson suggested that, without Young, Orion would not enjoy the same level of access that SSI had enjoyed in the past, which prompted a discussion about possible arrangements whereby Nelson could continue to work on behalf of the

---

[3] Recordings of these calls were introduced at trial through Young.

company.  Under one suggestion, Young, as a consultant to Orion, would have facilitated payments between Orion and Nelson, as Bernardino had done through the Wren Group.  However, both Nelson and Young were concerned that, because Orion was such a large company, Nelson would not have the same "coverage" with Orion as he had with SSI.  For this reason, Nelson and Young also discussed the possibility of presenting "opportunities" to a company named Manson Construction, an Orion competitor.

Before these opportunities materialized, however, Nelson and Young were approached by the FBI and were specifically asked about their relationship. Angela Kapala-Hill, the FBI Special Agent who conducted the interviews, testified that Young initially claimed that the $50,000 payment was for a "consulting fee," while Nelson claimed that it was a loan.  Nelson also denied having a business relationship with SSI.  However, according to Kapala-Hill, Nelson would later acknowledge that the payment was for providing SSI with "access" at JaxPort, and that, without these payments, he would not have helped the company to the extent that he did.[4]   Kapala-Hill further testified that Nelson admitted to knowing that the payments were illegal.[5]

---

[4] Young, who would become a cooperating witness for the Government, also eventually admitted that the payments were for providing access to JaxPort.

[5] On cross-examination, Kapala-Hill acknowledged that the word "bribe" did not appear in any of the Government's notes of her interviews with Nelson.  She also acknowledged that the notes from one of the interviews, prepared by another agent present at the meeting, reflected that

In January 2010, a grand jury indicted Nelson on one count of conspiracy to commit honest-services mail fraud, bribery, and money laundering (18 U.S.C. § 371); twelve counts of mail fraud based on checks mailed to Nelson through the Wren Group (18 U.S.C. §§ 1341, 1346); eleven counts of money laundering based on the same checks (18 U.S.C. § 1956(a)(1)(B)(I)); twelve counts of federal-funds bribery (18 U.S.C. § 666(a)(1)(B)); and one count of making a false statement to an FBI agent (18 U.S.C. § 1001).[6]  At the conclusion of a three-week trial, the jury found Nelson guilty on all but one count of mail fraud.  This appeal followed.

## II.

Nelson challenges his conviction on three grounds.  First, echoing concerns expressed in Justice Scalia's concurring opinion in Skilling v. United States, 130 S. Ct. 2896 (2010), Nelson argues that the mail fraud and bribery statutes under which he was convicted, 18 U.S.C. §§ 1341, 1346, 666(a)(1)(B), are unconstitutionally vague as applied to his conduct.  Second, Nelson argues that the district court's instructions to the jury on his honest-services mail fraud and federal program bribery counts were plainly erroneous because, according to Nelson, the instructions effectively provided, in a circular fashion, that "Nelson took a bribe if

_____

Nelson said that he "now" knows that the payments were "wrong," with the word "now" underlined.

[6] Counts 37-43, which charged Nelson with a separate fraud scheme, were severed and dismissed after trial.

10

he had the intent to do so and had the requisite intent if he in fact took a bribe," leaving the jury to speculate as to an essential point of law—i.e. what constitutes a "bribe."  Lastly, Nelson argues that the district court abused its discretion in admitting Naranjo's testimony about his November 2005 meeting with Nelson because the events described by Naranjo relate to uncharged conduct that preceded the alleged conspiracy.  We address these issues in turn.

## A.    Void for Vagueness

We review whether §§ 1341, 1346, and 666(a)(1)(B) are unconstitutionally vague as applied to Nelson's conduct de novo.  See United States v. Wayerski, 624 F.3d 1342, 1347 (11th Cir. 2010).  As an outgrowth of the Fifth Amendment's Due Process Clause, we have held that "[a] statute is void for vagueness if it fails to define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."  United States v. Tobin, 676 F.3d 1264, 1278 (11th Cir. 2012) (internal quotation marks omitted).  We have also recognized, however, that "[s]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."  United States v. Duran, 596 F.3d 1283, 1290 (11th Cir. 2010) (quoting United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)) (internal quotation marks omitted).  Where the law is definite, the

11

general rule is that knowledge of the law is presumed; ignorance of the law or a mistake of law is no defense to a criminal prosecution.  Id.

According to Nelson, all three statutes share the same infirmity:  as applied to the facts of his case, each lacks a "clear criterion of guilt" distinguishing between lawful and unlawful conduct.  Specifically, Nelson argues that, because his convictions for mail fraud and bribery ultimately rested upon allegations of "honest-services" fraud under § 1346, the absence of language in the statute describing the character and scope of the fiduciary relationship from which the honest-services obligation arises precluded Nelson (and the jury) from determining whether his relationship with Young and SSI was prohibited.[7]  This indeterminacy,

---

[7] The federal mail fraud statute prohibits the use of the mails in furtherance of a "scheme or artifice to defraud."  18 U.S.C. § 1341.  The "honest-services amendment," 18 U.S.C. § 1346, modifies the federal mail fraud statute to allow the United States to predicate a mail fraud charge on a "scheme or artifice to deprive another of the intangible right of honest services."  Thus, as modified, § 1341 provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to [deprive another of the intangible right of honest services], for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or takes or receives therefrom, any such matter or thing . . . shall be fined under this title or imprisoned not more than 20 years, or both.

In this case, the honest-services statute also potentially modifies the federal funds bribery statute, 18 U.S.C. § 666(a)(1)(B), which makes it a crime to "corruptly" demand, solicit, or accept a bribe.  The jury in this case was instructed that, "[t]o act 'corruptly' means to act voluntarily, deliberately and dishonestly to either an unlawful end or result or to use an unlawful means to accomplish an otherwise lawful end or result."  Nelson could thus be found to have acted "corruptly" under the bribery statute if he intended to deprive another of the right to his honest services.

12

he adds, allowed the jury to determine his guilt "based on the 'personal predilections' of its members," and enabled the Government to prosecute him in a discriminatory fashion.[8]

As discussed below, because Nelson's argument hinges on the supposed vagueness of the honest-services statute, we do not write on a clean slate. To frame our discussion, we first summarize the history of the honest-services doctrine and the relevant parts of the Supreme Court's decision in Skilling, which upheld § 1346 against a facial challenge on due process grounds through a limiting construction of that statute. Second, in light of the majority's reasoning in that case, we consider whether there is merit to Nelson's contention that the facts surrounding his arrest and conviction are such that it would violate due process to uphold his convictions under §§ 1341, 1346, and 666(a)(1)(B).

1.

The honest-services doctrine arose from various decisions interpreting the phrase "scheme or artifice to defraud" in the original mail fraud statute as encompassing not only deprivations of money or property but also certain "intangible rights." See Skilling, 130 S. Ct. at 2926. "Honest-services" fraud, these courts reasoned, differed from traditional fraud in that the victim of the fraud

---

[8] Nelson argued and lost a motion to dismiss for selective prosecution at trial. He does not appeal that ruling here.

did not necessarily suffer a loss of money or property.  See, e.g., Shushan v. United States, 117 F.2d 110, 119 (5th Cir. 1941).  For example, "if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss."  See Skilling, 130 S. Ct. at 2926.  In that example, the actionable harm derived from "the denial of that party's right to the offender's 'honest services.'"  Id. (quoting United States v. Dixon, 536 F.2d 1388, 1400 (2d Cir. 1976)).

In 1987, however, the development of the "intangible rights" line of cases, and thus the honest-services doctrine, came to a halt with the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987).  The McNally Court held that the mail fraud statute must be read as limited in scope to the protection of property rights.  Id. at 360.  "If Congress desires to go further," the Court added, "it must speak more clearly than it has."  Id.

Congress responded the following year by adopting § 1346, which provides: "For the purposes of [Chapter 63 of Title 18 of the United States Code ("Mail Fraud and Other Fraud Offenses")], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  In effect, the statute restored the mail fraud statute to its pre-McNally position and incorporated those decisions of the courts of appeals recognizing an

14

intangible right to honest services.  Skilling, 130 S. Ct. at 2928; United States v. Walker, 490 F.3d 1282, 1297 n. 16 (11th Cir. 2007).

Against this background, Jeffrey Skilling, the former Chief Executive Officer of Enron Corporation, appealed his conviction in the Southern District of Texas for conspiracy to commit honest-services wire fraud under § 1346, arguing that § 1346 was unconstitutionally vague in violation of the Fifth Amendment.[9] Styling his argument as a facial, rather than as an as-applied challenge to the statute, Skilling identified what he believed were fatal indeterminacies in § 1346 and the decisional law it incorporated.  Of relevance here, Skilling claimed that the pre-McNally honest-services cases, and thus the statute itself, failed to address or were in conflict on various core issues, such as whether the obligation to provide honest services extends only to persons taking "official action" and whether the use of the fiduciary position to accomplish the alleged fraud is a necessary element of the offense.  See Brief for Petitioner at 40–42, 130 S. Ct. 2896 (2010).  "Without consensus on these basic questions," Skilling maintained, "any argument that the statute codified a single, coherent, preexisting conception of honest services—a conception obviously available to ordinary persons from prior caselaw—falls apart completely."  Id. at 42.

---

[9] Skilling also argued that § 1346 did not reach his conduct (artificially inflating stock prices to profit from increased salary and bonuses).

While acknowledging that Skilling's argument "ha[d] force," as the pre-McNally cases "were not models of clarity or consistency," the Supreme Court held that any vagueness concerns regarding § 1346 could be obviated through a limiting construction of the statute.  Id. at 2929 – 31.  "The 'vast majority' of the honest-services cases," the Court observed, "involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes."  Id. at 2930 (citing United States v. Runnels, 833 F.2d 1183, 1187 (6th Cir. 1987)).[10]  By limiting the scope of § 1346 to these "core" pre-McNally applications, the Court found that § 1346 did not present any due process concerns, either in terms of fair notice or the risk of arbitrary and discriminatory enforcement.  Id. at 2931– 33. The Court concluded:  "[a] criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds."  Id. at 2934.[11]

Writing separately, Justice Scalia responded that, even if the pre-McNally honest-services doctrine could be pared down to a bribery and kickback core (he

---

[10] Surveying various pre-McNally decisions, the Court noted that the circuit courts uniformly described bribery and kickbacks as the "core," "most obvious," "typical,"  "clear-cut," and "uniform[]" forms of honest-services fraud.  Id. at 2931.

[11] Despite upholding the constitutionality of the honest-services statute, the Court vacated Skilling's conviction on the basis that, following the limiting construction of § 1346, his conduct did not lie within the reach of the statute.

believed it could not),[12] limiting the statute in this manner would still not solve its "most fundamental indeterminacy:  the character of the 'fiduciary capacity' to which the bribery and kickback restriction applies."  Id. at 2938 (Scalia, J., concurring in part and concurring in judgment).  "What," he asked rhetorically, "is the criterion of guilt?" Id. at 2939.  Without a clear answer to this question (among others), Justice Scalia reasoned, § 1346 did not give sufficient notice of the conduct prohibited under the statute.[13]

The majority responded to this argument in a footnote, explaining that debates concerning the source and scope of fiduciary duties were "rare" in pre-McNally bribery and kickback cases, and that "[t]he existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute." Id. at 2931 n. 41.   As examples, the Court cited the relationships between public officials and the public, employers and employees, and union officials and union members.  Id.  Later in the opinion, the Court added that, "[a]s to fair notice . . . it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute

---

[12]  Justice Scalia remarked:  "Perhaps it is true that 'Congress intended § 1346 to reach at least bribes and kickbacks.  That simply does not mean, as the Court now holds, that § 1346 criminalizes only bribery and kickbacks." Id. at 2939 (Scalia, J., concurring in part and concurring in judgment) (emphasis in original) (internal citations omitted).

[13]  Justice Scalia concurred with the majority in that he agreed that Skilling received a fair trial and that Skilling's honest-services conviction should be reversed. Unlike the majority, however, Justice Scalia would have vacated Skilling's conviction on constitutional grounds.

honest-services fraud, and the statute's <u>mens rea</u> requirement further blunts any notice concern." <u>Id</u>. at 2933 (internal citations omitted).

2.

Against this narrow framework, Nelson challenges his convictions below on an as-applied basis, arguing that the scope of his fiduciary obligations to JaxPort were indeterminate under §§ 1341, 1346, and 666(a)(1)(B). As a result, Nelson argues, he and the jury were left without any criterion by which to judge whether the payments he received from Young and SSI were proper, such as legitimate payments to a lobbyist, or improper, such as bribes. Further, he argues, the jury was left without any guidance in determining whether he acted with "corrupt intent" or the "intent to defraud," as is required under these statutes.

Nelson emphasizes that his is not a "prototypical" bribery case where "neither the financial relationship between the public official and his payor nor the acts performed by the official on behalf of the payor are legitimate . . . ." Rather, he argues, this is a case where "neither the existence of a contractual financial relationship with a public official nor the conduct engaged in by the public official is—without more—illegitimate." To this point, Nelson notes that, as an unpaid and part-time board member, he was allowed to do business with companies that contract with JaxPort, provided only that he abstain from voting on any matters in which he might have a conflict of interest. He adds that, as a board member, he

18

never voted on a contract under which Young or SSI stood to benefit, and that, for much of his tenure, all of JaxPort's contracts with private companies were approved by JaxPort's staff, rather than by its board.

Of course, that this case is not "prototypical," or that Nelson claims that he did not personally know that his conduct was unlawful, does not necessarily mean that the statutes under which he was convicted are unconstitutional as applied. "Void for vagueness simply means that criminal responsibility should not attach where one <u>could</u> <u>not</u> reasonably understand that his conduct is proscribed." <u>United States v. Nat'l Dairy Prods. Corp.</u>, 372 U.S. 29, 32 (1963) (emphasis added).  It does not mean that the statute must define every factual situation that may arise. <u>United States v. Biro</u>, 143 F.3d 1421 (11th Cir. 1998).  The existence of "marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." <u>Id</u>. at 1430 (quoting <u>United States v. Petrillo</u>, 331 U.S. 1 (1947) (internal quotation marks omitted)).  Moreover, ignorance of the fact that one's conduct is a violation of the law is no defense to criminal prosecution. <u>United States v. Duran</u>, 596 F.3d 1283, 1291 (11th Cir. 2010) (citing <u>Cheek v. United States</u>, 498 U.S. 192 (1991)).

In light of these principles, as well as the majority's reasoning in <u>Skilling</u>, we conclude that the statutes at issue gave Nelson adequate notice of the conduct

19

they prohibit.  At the outset, we note that the supposed "indeterminacies" that Nelson highlights in these provisions—namely, the absence of statutory language or pre-McNally caselaw explicitly defining the scope of the honest-services obligation—were acknowledged by the Skilling majority and found insufficient to warrant striking down § 1346 on vagueness grounds.  We thus reject Nelson's contention that "the issues raised by Justice Scalia were simply not addressed by the majority, and thus remained as problems for the lower courts to address in the future."

While it is true that Skilling does not foreclose an as-applied challenge to the § 1346 (or to other statutes under which criminality may depend on whether the defendant intended to violate his or her duty of honest services), we are mindful of the Supreme Court's observation that defendants charged with bribery or kickbacks face an uphill climb in arguing they did not and could not reasonably understand that their conduct was illegal under the statute.  We are similarly reluctant to find § 666(a)(1)(B) unlawful as applied, as Nelson's challenge to the federal funds bribery statute is essentially the same as his challenge to the mail fraud and honest-services provisions.[14]

---

[14] Nelson seems to argue that, because § 666(a)(1)(B) required that the jury find that he acted "corruptly," the indeterminacy of his fiduciary obligations under the honest-services statute spill over into his federal funds bribery charges.  We note that we recently held that the phrase "corrupt[] . . . intent to influence or reward" in the bribery context is unambiguous, particularly in light of statute's scienter requirement.  See United States v. Benner, 442 F. App'x 417, *1

20

Simply put, we find that there is nothing in the nature of Nelson's conduct or his role on the JaxPort board, in particular, that separates him from those similarly charged with bribery who, according to the Supreme Court, "cannot tenably complain about . . . vagueness." Nelson's case is not exceptional. In the first place, though he was not paid for his work as a JaxPort board member and worked only part time, Nelson does not dispute that he was a public official. As we have previously held, "[p]ublic officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest." United States v. de Vegter, 198 F.3d 1324, 1328 (11th Cir. 1999) (citing United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (1997)). Indeed, we have described bribery of a public official as the "paradigm case" of honest-services fraud. United States v. Langford, 647 F.3d 1309, 1321 (11th Cir. 2011).

Further, the evidence presented at trial reflects that Nelson agreed to represent SSI's interests before JaxPort in exchange for monthly payments routed through a middleman. While we have not held that a quid pro quo exchange is required in all honest-services cases, the existence of such an arrangement undoubtedly blunts any argument that the defendant lacked notice that his conduct was unlawful. This "classic" bribery and kickback scenario, like the scheme at

---

(11th Cir. 2011) (affirming the defendant's conviction under 18 U.S.C. § 215(a)(1)). Accord United States v. McElroy, 910 F.2d 1016, 1021 (2d Cir. 1990).

21

issue in McNally, is squarely within the range of conduct that Congress aimed to

prohibit through the passage of § 1346.  See Skilling, 130 S. Ct. at 2922.[15]

We also find unpersuasive Nelson's argument that §§ 1341, 1346, and

666(a)(1)(B) are vague as applied because these statutes and the cases interpreting

them do not explicitly limit their application to bribes and kickbacks taken in

connection with the performance of one's "official" or "customary" powers or

duties.  Even if, for argument's sake, we were to find the statutes vague in this

regard, Nelson's argument assumes that his actions did not involve the exercise of

his official or customary powers.[16]  We disagree.  For purposes of the honest-

services and federal funds bribery statutes, a board member who uses his position

of authority to direct or influence someone else in his organization to do something

---

[15] In finding that Congress intended to "reverse" McNally on its facts," the Skilling majority rejected the Government's argument that § 1346 proscribes all "undisclosed self-dealing by a public official or private employee—i.e. the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty."  130 S. Ct. at 2932 (internal quotation marks omitted).  Nelson argues that several of our earlier decisions, upon which we rely today, similarly recognize an unrestrained "undisclosed conflict of interest" theory of honest-services fraud.  See, e.g., Lopez-Lukis, 102 F.3d at 1169 ("If the official secretly makes his decision based on his own personal interests . . . the official has defrauded the public of his honest services.").  See also Langford, 647 F.3d 1309 at 1321–22.  We do not read these decisions so broadly.  These cases did not involve a "mere failure to disclose a conflict of interest."  See Skilling, 130 S. Ct. at 2932.  Rather, all of these cases, like the instant case, involved public officials who solicited or accepted bribes or kickbacks—"classic honest services fraud that existed before, and after, Skilling."  See Langford, 647 F.3d at 1322 n 9.

[16] Nelson stresses that the evidence presented at trial established only that, as a member and chair of the JaxPort board, his official duties were to vote on certain contracts, none of which were involved in this case, and to appoint and provide long-term "vision and guidance" to the JaxPort's chief executive officer.  "[T]here was no evidence that [his] duties included any hands-on, day to day involvement in the running of [JaxPort]."

22

that he could not do himself is nonetheless acting in his official capacity. <u>See</u>

<u>generally</u>, <u>Lopez-Lukis</u>, 102 F.3d 1164 (11th Cir. 1997).[17]  It is the authority

inherent in his position as a board member that has enabled him to exercise his

influence in the first place, and he has a duty to exercise those powers honestly and

in the organization's interests, rather than his own.

Finally, to the extent there is any doubt as to the meaning of §§ 1341, 1346,

and 666(a)(1)(B) as applied to this case, we find that any potential vagueness in

these provisions is mitigated by their <u>scienter</u> requirements.  <u>See</u> <u>Skilling</u>, 130 S.

Ct. at 2933; <u>Benner</u>, 442 Fed. App'x at 420.  As noted above, due process does not

require that criminal statutes speak with absolute clarity as to all possible

applications.  "The constitutionality of a vague statutory standard is closely related

to whether that standard incorporates a requirement of <u>mens</u> <u>rea</u>."  <u>United States v.</u>

---

[17] <u>Lopez-Lukis</u> involved a public official who accepted bribes in exchange for her vote and the use of her influence to secure a majority vote from other board members on those matters.  <u>See</u> 102 F.2d at 1168.  Considering these acts independently of one another, we observed:

> The appellees concede that a county commissioner commits honest-services fraud when she sells her vote.  It is no less a violation of sections 1341 and 1346, however, for that commissioner, in addition to selling her vote, to take steps to ensure that a majority of commissioners vote with her.  In both scenarios, the commissioner deprives her constituents of their right to her honest services by deciding how to vote based on her own interests.  The second scenario simply makes this deprivation more concrete.  In addition to depriving her constituents of their right to her honest services, she seeks to ensure that the actions the Board takes are in her own bests interests instead of the best interest of the public.

102 F.2d at 1168 (internal citations omitted).

Waymer, 55 F.3d 564, 568 (11th Cir. 1995) (citing Colautti v. Franklin, 439 U.S. 379, 395 (1979)).  In this case, to convict Nelson for honest-services fraud, the Government had to prove that he "devised or intend[ed] to devise any scheme or artifice to [deprive another of the intangible right of honest services]." See 18 U.S.C. § 1341, 1346.  Likewise, to convict Nelson of federal funds bribery, the Government had to prove that he "corruptly" solicited or demanded something of value, "intending to be influenced or rewarded . . . ."  18 U.S.C. § 666(a)(1)(B). We are satisfied that, if in fact Nelson reasonably believed that his conduct was lawful, due to the nature of his role on the JaxPort board or for any other reason, the jury could have found that he did not have the intent required to commit these crimes.[18]  The jury did not.

## B.    The Court's Instructions to the Jury

Next, Nelson argues that we should vacate his mail fraud and federal funds bribery convictions because the manner in which the district court instructed the jury on these charges "failed to provide the jury with a means of discerning

---

[18] Jury Instruction No. 21 provided that:

> 'Good faith' is a complete defense to a charge that requires intent to defraud.  A defendant isn't required to prove good faith.  The Government most prove intent to defraud beyond a reasonable doubt.  An honestly held opinion or an honestly held belief cannot be fraudulent intent—even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.

whether [he] took a bribe." Nelson concedes that, because he did not raise this objection at trial, plain error review applies. See United States v. House, 684 F.3d 1173, 1196 (11th Cir. 2012) (citing United States v. Felts, 579 F.3d 1341, 1343 (11th Cir. 2009)). Thus, we will reverse his convictions only if the jury instructions, considered as a whole, "[were] so clearly erroneous as to result in a likelihood of a grave miscarriage of justice, or the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." United States v. Starke, 62 F.3d 1374, 1381 (11th Cir. 1995).

Nelson cites to two points of error in the court's instructions, both concerning what he argues are "hopelessly circular" propositions on an "essential point of law"—i.e. what constitutes a "bribe." First, Nelson argues that the court's honest-services instruction was circular because the phrase "intent to defraud," defined in the instruction as "act[ing] knowingly and with the specific intent to solicit, demand, or accept bribe payments," conflated the statute's mens rea requirement with the underlying criminal conduct: bribery. Thus, Nelson argues, the jury was effectively instructed that "Nelson took a bribe if he had the intent to do so and he had the requisite intent if he in fact took a bribe." As Nelson concedes, however, he specifically requested that the language "specific intent to

solicit, demand, or accept bribe payments" be included in the court's instruction.[19]

Further, when the court asked Nelson's attorney whether the instruction as finally written conformed to what he requested, Nelson's attorney replied, "Yes, sir." Nelson cannot now complain about the circularity of an instruction that he, through counsel, requested and approved.[20] See United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005) ("When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error.").

Nelson's second argument is similarly unavailing. According to Nelson, because the court's instructions provided that corrupt intent is an element of both honest-services fraud and federal funds bribery, and because the term "corruptly" was defined therein as requiring the jury to find that Nelson intended to act

---

[19] Our pattern instruction for §§ 1341 and 1346 defines the phrase "intent to defraud" as meaning "to act knowingly and with the specific intent to deceive someone, usually for personal financial gain or to cause financial loss to someone else." See Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Basic Instruction 50.2 (2010). Maintaining that this "garden variety" definition is not suitable for cases that do not involve traditional deception, such as the instant case, Nelson's attorney asked the court to strike all of the language following "specific intent to" and replace it with "solicit, demand, or accept bribe payments." The court obliged.

[20] Nelson now claims that the only reason he requested this definition was "to insure that simple concealment would not be grounds for conviction." Be that as it may, whether Nelson had good reason to request the instruction does not change the fact that any resulting confusion was a product of his own doing.

26

"unlawfully,"[21] the jury was effectively instructed that Nelson "act[ed] 'corruptly' [if] his conduct [was] unlawful and his conduct [was] unlawful if he act[ed] corruptly." The net effect of this error, Nelson maintains, was to "propel[] the jury to look elsewhere to determine whether [he] engaged in culpable conduct and to engage in subjective individual judgments unmoored from any coherent legal standard."

We disagree. The court's definition of "corruptly," adopted verbatim from our pattern instruction for federal funds bribery, did not merely instruct the jury that Nelson "act[ed] 'corruptly' [if] his conduct [was] unlawful," but rather, it required—correctly—that the jury find that Nelson voluntarily and deliberately engaged in unlawful conduct. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Basic Instruction 24.2 (2010). In other words, Nelson had to know that accepting payments from SSI in exchange for representing the company's interests at JaxPort was something that the law forbids. The jury was thus propelled to look to Nelson's state of mind in joining the conspiracy—a task that, as noted above, the jury was equipped to take on.

In any event, even to the extent that the court's instructions may be considered to contain a degree of circularity, we are not left with "substantial and

---

[21] The term "corruptly" was defined in the federal funds bribery instruction as acting "voluntarily, deliberately and dishonestly to either accomplish an unlawful end or result or to use an unlawful method or means or result." The term was not defined in the honest-services instruction.

27

ineradicable doubt as to whether the jury was properly guided in its deliberations." See United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996). On the whole, the instructions "accurately express the law applicable to the case." See id. And, as other circuits have observed, the term "corruptly" has a commonly understood meaning. See United States v. McElroy, 910 F.2d 1016, 1021 ("The term 'corruptly' is ordinarily understood as referring to acts done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.") (internal quotation marks omitted); United States v. Pommerening, 500 F.2d 92, 97 (10th Cir. 1974) (The "words 'corruptly', 'value', and 'influence' are applied in their ordinary, everyday sense. It is obvious from reading [18 U.S.C. §] 201(b) that Congress intended to prohibit individuals from giving government employees, while they are acting in their official capacity, compensation in return for special favors."). We therefore decline to reverse Nelson's convictions merely because isolated clauses of the jury instruction may be "confusing, technically imperfect, or otherwise subject to criticism." Beasley, 72 F.3d at 1525.

## C.    The Testimony of Louis Naranjo

Finally, Nelson argues that the district court erred under Rule 403 of the Federal Rules of Evidence in admitting the testimony of JaxPort's director of procurement, Louis Naranjo, who testified regarding a meeting he had with Nelson

28

before the alleged conspiracy.  Rule 403 permits a trial judge to exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.  The court's authority should be used sparingly, however, as "the balance under Rule 403 should be struck in favor of admissibility."  United States v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989).  Similarly, on appeal, we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."  Id.  Only upon a clear showing of abuse of discretion will we reverse a trial court's evidentiary ruling.  See United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009).  "[W]e must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

As explained above, the testimony at issue pertained to a November 2005 meeting wherein Nelson, in the presence of JaxPort's CFO, Ron Baker, complained to Naranjo about JaxPort's dredging contractor, SeaTech, and asked Naranjo to cancel JaxPort's contract with the company.  According to Young, Nelson also suggested that SSI was "ready to go."  Nelson objected to the admission of this testimony at trial, but the district court, following a proffer examination of the witness, concluded that Naranjo's testimony would not be

29

unfairly prejudicial. The district court later reaffirmed this ruling when denying Nelson's motion for a new trial.

On appeal, Nelson argues that, by admitting Naranjo's testimony, the district court "invited the jury to convict [him] on the basis of uncharged conduct." Specifically, Nelson highlights the fact that the events described in Naranjo's testimony took place almost a full year before Nelson and Young's alleged conspiracy. Nelson also stresses that, in the broader context of the Government's case, Naranjo's testimony "stood alone as a dramatic instance of Nelson pressuring a [JaxPort] staff member in apparent support of SSI." Nelson argues that "[t]here was no evidence of similar conduct during the course of the conspiracy."

On balance, and in light of the principles described above, we do not find that the district court abused its discretion in allowing Naranjo's testimony. Although Naranjo's testimony related to conduct that preceded the conspiracy alleged in the indictment, it was unquestionably probative as to a number of issues bearing upon Nelson's guilt. For example, Naranjo's testimony corroborated and gave context to Young's testimony that, in asking to be "put on the payroll," Nelson told Young that he was already doing "twice as much" for SSI as Forentino was doing. Likewise, Naranjo's testimony illustrated how and to what degree Nelson was capable of exercising influence over JaxPort staff—particularly its CFO, Ron Baker, who arranged the meeting between Nelson and Naranjo. Thus,

30

the jury might have reasonably inferred from Naranjo's testimony that, at the time of the conspiracy, Nelson believed that his meeting with Baker and Naranjo was illustrative of the type of favors that he was willing and able to offer SSI in exchange for bribe payments.

At the same time, however, Naranjo's testimony was not necessarily prejudicial to Nelson's case, as other inferences could be drawn from the November 2005 meeting. As recognized by the district court, Naranjo's cross-examination of Naranjo highlighted various issues related to SeaTech's performance from which the jury might have reasonably inferred that "Nelson was doing everybody a favor by suggesting that SeaTech be terminated." This conclusion lends support to Nelson's theory of the case—namely, that, in representing SSI's interests at JaxPort, he was never in violation of his fiduciary obligations to the board or to the public.

Accordingly, we find that the district court did not make a clear error of judgment or apply the wrong legal standard in admitting Naranjo's testimony.

## III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

31

WILSON, Circuit Judge, concurring:

The dissent may well be correct that the investigation of Nelson began with a pre-Skilling theory of criminal concealment. And if the Government's case rested only on Nelson's nondisclosure of the SSI payments, then I would be inclined to agree with the dissent that no crime within the meaning of § 1346 occurred. Skilling definitively foreclosed the possibility that honest services fraud could criminalize undisclosed conflicts of interest. But the record shows that Nelson did not merely hide a business relationship—he hid payments that were intended to influence his actions as the chairman of JaxPort. It should come as no surprise that bribes are often concealed. Nelson's concealment was not the crime; it was merely a symptom.

I am also unpersuaded that Young's payments to Nelson were not bribes because they were "permitted." Permitted by whom? Nelson points to two grounds: the rubber stamp of Jacksonville's General Counsel Cindy Laquidara, and the fact that Nelson refrained from voting on SSI matters. For starters, a municipality's legal opinion hardly binds the Justice Department or this court. More importantly, Laquidara based her opinion on a mere fraction of the truth, because Nelson only revealed to her that he had submitted a joint bid with SSI to the United States Army Corps of Engineers. He did not reveal the most important information: he was on SSI's payroll as a lobbyist.

32

Nelson's only remaining justification is that he recused himself from voting on matters involving SSI.  This presumably stems from section 112.3143(3)(a) of the Florida Statutes, which provides that no "public officer shall vote in an official capacity upon any measure . . . which he or she knows would inure to the special private gain or loss of any principal by whom he or she is retained."  Although this argument must undoubtedly fail, it reveals that Nelson is likely as much a victim of circumstance as his own cupidity.  Nelson seems to have been under the impression that as long as he recused himself, he could accept any payment that came his way.

Yet it cannot be the case that public officials are immune from the federal corruption laws simply because they refrain from voting "yea" or "nay," for the simple fact that it cannot be seriously contended that Nelson's influence on the board was limited to voting.  The record contained numerous instances of Nelson exerting influence on SSI's behalf.  Although we have not decided if bribery in the honest services context requires a showing of quid pro quo, even assuming that it does, this case obviously meets that standard.  See United States v. Siegelman, 640 F.3d 1159, 1173–74 (11th Cir. 2011), cert. denied, 132 S. Ct. 2711 (2012).  For example, Young testified that he asked for, and received, Nelson's help in obtaining a change order's approval that added almost $150,000 of work to SSI's contract.  Young also testified that he understood his payments to Nelson to be

33

bribes.  There was more than enough evidence for a jury to find that Nelson knowingly accepted payments that were intended to influence his acts as a public official.

It is unfortunate that it appears to have been routine for JaxPort board members to lobby for companies that routinely brought business before it.  It is entirely conceivable that Nelson became swept up in what was the standard operating procedure for the board's unpaid, part-time members.  The dissent points out that Fiorentino, a fellow board member and lobbyist, was "innocent" simply because he did not conceal his financial relationship with Young.   I must agree that I am unable on this record to discern a difference between Fiorentino's conduct and Nelson's.  But Fiorentino's lack of a conviction does not automatically gut Nelson's.  For whatever reason, the Government opted not to pursue Fiorentino, and the Court has no authority—absent very unusual circumstances—to interfere with the exercise of the prosecutor's charging discretion.

HILL, J., dissenting:

Tony Nelson concealed his financial relationship with SSI from JaxPort. This was not a crime. The investigation of him and the indictment against him, however, were instigated at a time when such concealment was thought by all to be a crime. After Skilling, we know that it never was. Nelson's concealment of a financial interest in SSI was not a violation of his fiduciary duty to JaxPort. It did not deprive JaxPort of his honest services.[1]

Nevertheless, Nelson was convicted of honest services fraud. The evidence was that he was told that, as a part-time, unpaid member of JaxPort Board, he could lawfully advocate on behalf of SSI – as a paid lobbyist, just as was Fiorentino – and he did so. The evidence was that he was told he could not vote on any matter involving SSI and that he did not do so.[2]

---

[1] During the time of misapprehension by many that concealment would be criminal, FBI agents made an early-morning, unannounced call on Nelson at his home. One agent questioned him and another made notes. During the meeting, Nelson admitted that he had not told JaxPort of his relationship with SSI. This concealment would have been seen as enough for a prosecution at the time. Thereafter, Skilling was decided; the prosecution became one for bribery.

[2] I am troubled by the concurrence's reference to Jacksonville General Counsel's advice to Nelson that he was permitted to be a paid lobbyist for SSI so long as he did not vote as a "rubber stamp" opinion. The reference implies that there was something wrong or lacking in the opinion and there is no evidence in the record to support such an inference. Furthermore, if Nelson was not entitled to rely on Jacksonville's rules – as interpreted by its own lawyer and regarding its own entity – to guard that his behavior was not in violation of those rules, then how is any local official safe from federal prosecution based on its own interpretation of those rules.

35

The evidence was that no economic harm befell JaxPort as the result of Nelson's lobbying for SSI.[3]

So the question becomes, where is the crime here?  The only difference that I can see between what the government says is the innocent conduct of Fiorentino and the guilty conduct of Nelson is that Nelson concealed his relationship with SSI.  This is not a crime.  Skilling flatly rejects such a theory of honest services fraud.

The majority opinion correctly states that in order to be guilty of honest services fraud, the jury had to find that "Nelson voluntarily and deliberately engaged in unlawful conduct."  But then it goes on to say that "Nelson had to know that accepting payments from SSI in exchange for representing the company's interest at JaxPort was something that the law forbids."  But this is not so.  The law did not forbid Nelson from representing SSI's interests – only from voting on any matter affecting them, which he did not do.

So, once again – where is the crime here?

As a result of Skilling, I believe that a financial concealment case morphed into a bribery prosecution.  The only remaining problem – but a pretty significant one – was that Nelson had been told that he could accept payment from SSI to

---

[3] The concurrence notes that Nelson helped SSI get a change order.  This is no evidence of wrongdoing – the testimony was that SSI was due the change order and the additional payment.  Nelson's conduct in assisting SSI to get the change order, therefore, could not be a violation of his duty to JaxPort.

advocate on its behalf in connection with the JaxPort.  His agreement with SSI to do so – and to receive payment for doing so[4] – cannot be a bribe if it is permitted.  Therefore, the government's theory became that the concealment of his financial relationship – although not a crime in itself – was evidence that Nelson's intent in accepting payment was corrupt, making otherwise legal payments illegal – a bribe.

There are two problems with this theory.  The first is a legal objection and the second a failure of proof.

First, the government failed to prove Nelson had a corrupt intent to be bribed.  The government proved only that Nelson sought to conceal his relationship with SSI – not why.  Contrary to the majority opinion, the government did not prove that Nelson thought what he was doing was illegal.  The word "bribery" does not appear anywhere in the FBI agent's notes of her interviews with Nelson.  She admitted at trial that those notes contain Nelson's statement that he "now" knows that the payments were "wrong."[5]  The word "now" was underlined three times by the agent.   Clearly Nelson sought to hide the SSI payments.  I do not know why.  But neither does anyone else – least of all the jury.  Perhaps tax evasion was his motive.  That is a crime; just not the crime charged here.

---

[4] It should be noted, I think, that Nelson received payment monthly whether he accomplished anything or not.

[5] The concurrence notes that Young testified that he thought the payments were bribes, but Young's *mens rea* cannot be used to convict Nelson.

Second, and more importantly, concealment alone is legally insufficient to prove Nelson had corrupt intent to be bribed. If Nelson had no duty to disclose his financial relationship with SSI, as Skilling says, and the payments were permitted, as he was told, then the jury was not permitted to infer a corrupt intent to be bribed by his concealment. The government's theory was that – although concealment is not a crime – it was evidence of corrupt intent and this mens rea turned lawful lobbying into unlawful bribery. I disagree. Bribery requires a corrupt agreement to perform an unlawful official act – an actus reus. In this case, Nelson agreed to perform a lawful act. The lobbying was permitted. An agreement to perform a lawful act is called a contract, not bribery. Even if the government had proved a mens rea, I don't believe that it proved an actus reus in this case.

In my view, the jury instructions in this case were fatally defective. The jury was instructed that Nelson had a duty to JaxPort, the existence of which is an essential element of the crime of honest services fraud. But they were never enlightened as to the nature and limits of this duty. The unique circumstance of this case – that Nelson was a part-time, unpaid member of the board, fully entitled to lobby JaxPort on behalf of SSI and to be paid for those efforts – required that the jury be carefully instructed as to the limits of his duty to JaxPort. That was not done. If it had, maybe he would have been acquitted.

Nor did the instructions require the jury to find any corrupt intent apart from Nelson's concealment of his relationship with SSI. If his acceptance of payment was not unlawful, then the only evidence upon which the jury could have concluded that he had a corrupt intent in accepting them was that he concealed them. But we know that concealment cannot be the crime here.

The majority says that if these instructions were error, the error was not plain. I disagree. Failure to adequately instruct the jury on the scope of Nelson's duty to JaxPort – an essential element of the crime of honest services fraud – and the necessity to find a violation of that duty is fatal to the verdict. Failure of the instructions to require the jury to find that he had a corrupt intent – apart from his concealment of a financial interest in SSI – was also fatal to the verdict.

For these reasons, I respectfully dissent.